FAIR, J.,
for the Court:
¶ 1. During a turbulent period in their lives, unmarried parents Gavin Wallace and Brigit Clark left their nine-month-old son Henry in the care of Gavin’s sister and her husband, Alexis and Peter Hammond.[1] For about three years the natural parents had limited contact with Henry, until the Hammonds filed a petition to terminate their parental rights and adopt him. The chancellor found that Gavin and Brigit’s total failure to visit Henry had produced a substantial erosion of the parent/child relationship, a statutory ground to terminate their parental rights.[2] The chancellor further found adoption by the Hammonds to be in Henry’s best interest and granted the adoption. Gavin and Brigit appealed.
*1104 FACTS
¶ 2. Shortly after Henry’s birth in 2007, Gavin and Brigit were evicted from then-residence in Indiana. The Hammonds invited them to come to Mississippi to get their lives back on track. However, Gavin was unable to maintain employment, and Brigit became pregnant again shortly after arriving. Brigit suffered from what was ultimately diagnosed as schizoaffective disorder, and she did not take her medication out of fear it would harm the unborn child. Gavin and Brigit initially stayed in the home of the Hammonds, but they were asked to leave after stealing a small amount of money. The couple continued to be supported by the Hammonds, but they stayed in a series of hotels and other temporary residences until Brigit’s mental health deteriorated to the point that she asked her family in Indiana to come and take her home for treatment. Before she left, Gavin took Henry from Brigit and left him with the Hammonds. Brigit went back to Indiana, where she was committed to a mental health facility for approximately three months. Gavin consented to a temporary guardianship of Henry by the Hammonds, and he left for California a short time later. According to the Ham-monds, when they took Henry in, he was overweight and developmentally behind.
¶ 3. Gavin established a home in California, and Brigit joined him there after completing her treatment and giving birth to their second child, “Carol.” Brigit began receiving Social Security disability benefits, but she testified that her mental health had improved significantly in recent years. Gavin and Brigit became engaged to marry and both enrolled in a local community college. Although the home situation improved, Gavin’s employment remained unstable, and the couple was largely supported by student loans and grants. For three years after leaving Henry with the Hammonds, Gavin and Brigit called approximately every two or three weeks. They also sent Christmas and birthday gifts, but they never visited the child in person. Gavin and Brigit attributed this to their financial situation and the Hammonds’ unwillingness to cooperate in scheduling a time to visit. They did not visit Henry until after the Ham-monds’ petition to adopt him was filed.
¶ 4. The chancellor appointed a guardian ad litem (GAL), who ultimately recommended termination of Gavin and Brigit’s parental rights and Henry’s adoption by the Hammonds. After three days of trial, the chancellor concluded that Gavin and Brigit’s long-distance efforts had failed to preserve their relationship with Henry. The court found a “total” erosion of the parent/child relationship as a result of the failure to visit,[3] which was unreasonable and solely attributable to Gavin and Brigit. The chancellor also concluded that Henry regarded the Hammonds as his parents, that Henry “had no conscious memory” of Gavin and Brigit as his parents, and that efforts to reintroduce them during the pendency of the litigation had been unsuccessful and were causing the child confusion and stress. The chancellor concluded that adoption by the Hammonds was in Henry’s best interest.
DISCUSSION
¶ 5. Gavin and Brigit appeal the chancery court’s termination of their parental rights and grant of adoption. They present a single issue — whether the chancellor’s decision to terminate their parental rights was supported by substantial evidence.
*1105 ¶ 6. To terminate parental rights over a parent’s objection, “[t]he trial judge must be satisfied by clear and convincing proof that the [parent] was within the grounds laid out within the statute[.]” In re V.M.S., 938 So.2d 829, 834 (¶ 11) (Miss.2006). Generally speaking, that means the party seeking to adopt must “show by clear and convincing evidence that the objecting parent has either abandoned or deserted the child or is mentally, morally or otherwise unfit to rear or train the child.” Natural Mother v. Paternal Aunt, 583 So.2d 614, 619-20 (Miss.1991); see also Miss.Code Ann. § 93-17-7. The party must also overcome the “strong presumption ... that the natural parent should retain his or her parental rights.” In re V.M.S., 938 So.2d at 834 (¶ 11). The court must always keep in mind that “the best interest of the child is the paramount consideration.” In re K.D.G. II, 68 So.3d 748, 751 (¶ 12) (Miss.Ct.App.2011). But our law has “never allowed termination of parental rights only because others may be better parents.” M.L.B. v. S.L.J., 806 So.2d 1023, 1029 (¶ 11) (Miss.2000). Termination of parental rights must be based on abandonment, desertion, or unfitness of the parent. Natural Mother, 583 So.2d at 619-20.
¶ 7. On appeal, we must answer the question of “whether credible proof exists to support the chancellor’s finding of fact by clear and convincing evidence.” W.A.S. v. A.L.G, 949 So.2d 31, 34 (¶ 7) (Miss.2007).
¶ 8. Brigit and Gavin address most of their arguments on appeal to the ground of abandonment. They contend there was no clear and convincing proof of a “settled purpose to forego all duties and relinquish all parental claims to the child,” as abandonment has been defined. Ainsworth v. Natural Father, 414 So.2d 417, 419 (Miss.1982). We agree, but this argument neglects to address the other independent grounds for termination — desertion and misconduct. See In re Adoption of Minor Child, 931 So.2d 566, 578 (¶ 33) (Miss.2006).
¶ 9. Relevant to the case at hand, section 93-15-103(3) provides:
Grounds for termination of parental rights shall be based on one or more of the following factors:
[[Image here]]
(b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
[[Image here]]
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment....
The chancellor’s decision was grounded in subsection (3)(f), a finding of “substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s prolonged and unreasonable absence [and] unreasonable failure to visit.” This was supported by the uncontested fact that Brigit and Gavin failed to visit Henry for approximately three years, beginning when the child was only nine months of age. In response, Gavin and Brigit point to evidence of communication — they called approximately every two or three weeks — but there was also significant evidence showing that these attempts had been ineffective in preserving the parent/child relationship. We note that the statute provides that the erosion may be a result of either “pro *1106 longed and unreasonable absence” or “unreasonable failure to visit”; the law recognizes that communication in and of itself is not necessarily sufficient to preserve the parent/child relationship. Moreover, Gavin admitted in his testimony that, until Henry learned to talk, they did not speak directly with him on the phone, but instead Gavin spoke with Alexis about Henry.[4] And as part of their effort to show that Alexis and Peter alienated Henry from them, Gavin and Brigit admitted that they were often unable to speak with Henry when they called and that they felt they were unable to connect with him over the telephone.
¶ 10. There was also testimony that Henry regarded Alexis and Peter as his parents[5] and resisted attempts to reunite him with Gavin and Brigit. The chancellor explained from the bench:
[Gavin and Brigit] wanted me to watch ... [a video recording of some of their visits with Henry].... [W]hat I see is a little boy playing with a man. What I see is a little boy ... playing with another little girl. I don’t see a father and son relationship. It just could not possibly exist. That bond could not have been formed ... [even if, intellectually, [Henry] may understand that [Gavin] is his father....
The chancellor also cited testimony by the GAL, who had listened to some of the phone conversations between Gavin/Brigit and Henry and observed some of the visitations. The GAL noted that Henry resisted the idea that Gavin and Brigit were his parents, and he was especially adamant that “Bill,” Alexis’s teenage son, was his brother and not his cousin. The chancellor also found telling an incident during one of the visits where Henry had an “accident” and insisted that Peter, not Gavin, help him change his clothes.
¶ 11. It is important to note that the chancellor rejected Gavin and Brigit’s testimony faulting the Hammonds for the communication problems and failure to visit. Their accounts were directly contested by the Hammonds, who the chancellor found more credible. The chancellor attributed the blame entirely to Gavin and Brigit, and he further found that they had the means to visit, but had chosen other priorities. “Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation.” Bowen v. Bowen, 982 So.2d 385, 395 (¶ 42) (Miss.2008) (quotations omitted).
¶ 12. The chancellor, tracking the language of section 93-15-103(3)(f), concluded:
I do find by clear and convincing evidence that ... if there was [a parent/child relationship] established between [Henry] and his biological mother and father, ... there has been a complete erosion of that relationship, not just substantial but complete, and it has been caused by their unreasonable absence ... [and] their unreasonable failure to visit and communicate....
¶ 13. We recognize that in many cases the efforts of Gavin and Brigit — calling on a regular, if infrequent, basis and sending birthday and Christmas gifts — would have been sufficient to prevent a substantial erosion of the parent/child relationship. However, this case turns on the young age of the child when he was given up and the *1107 failure of the parents to establish a meaningful relationship during his formative years. Had Henry been older with a more firmly established bond to his parents, limited contact may very well have been sufficient to prevent termination of their parental rights.
¶ 14. After reviewing the record, we conclude that the chancellor’s finding of a substantial erosion of the parent/child relationship is supported by credible, clear and convincing evidence. It follows that the chancery court had the authority to terminate Gavin and Brigit’s parental rights on the basis of that erosion. We are, therefore, obligated to affirm that judgment.
¶ 15. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CARLTON AND JAMES, JJ., NOT PARTICIPATING.

. Because adoption proceedings are confidential, we have changed the names of those involved. During the relevant times, Peter was in his early sixties, Alexis and Gavin were in their late thirties or early forties, and Brigit was in her early or mid twenties. Henty (H.H.O.W.) is, at the time of this opinion, five years old.

. See Miss.Code Ann. §§ 93-17-7 & 93-15-103 (Rev.2004).

. See Miss.Code Ann. § 93 — 15—103(3)(f).

. Only Gavin and Alexis were on speaking terms at the time.

. Alexis and Peter testified that Henry had concluded they were his parents after he began attending daycare with other children.