# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00217-SCT

*FRANK HARTLEY, JR.*

*v.*

*JOHN D. WATTS AND LENITA S. WATTS*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/23/2014 |
| TRIAL JUDGE: | HON. EDWARD E. PATTEN, JR. |
| TRIAL COURT ATTORNEYS: | W. BRADY KELLEMS |
| | JOSEPH PRESTON DURR |
| | CHELI KELLEMS DURR |
| | DOUGLAS LAMONT TYNES, JR. |
| | DURWOOD J. BREELAND |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DOUGLAS LAMONT TYNES, JR. |
| ATTORNEYS FOR APPELLEES: | W. BRADY KELLEMS |
| | JOSEPH PRESTON DURR |
| | CHELI KELLEMS DURR |
| NATURE OF THE CASE: | CIVIL - ADOPTION |
| DISPOSITION: | AFFIRMED - 03/02/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1. Frank Hartley Jr. appeals the final judgment of the Chancery Court of Lincoln County terminating his parental rights to his two biological children, A.B. and B.H.[1] and granting an

---

[1] Because this case is confidential, the children will be referred to by their initials.

adoption to John D. and Lenita S. Watts. Finding that the judgment is supported by clear and convincing evidence, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Frank Hartley Jr. enlisted in the United States Air Force directly after graduating high school in 2003. In early 2004, after completing his training, he was stationed at Eglin Air Force Base located between Pensacola and Panama City, Florida. On August 21, 2004 he married Amanda Fullmer.

¶3.     During late 2005, Hartley and Remy Bartenbach met and had an affair resulting in Bartenbach's pregnancy.  Hartley and Bartenbach did not speak during much of the pregnancy.  In February 2006, Hartley and Fullmer divorced as a result of Hartley's affair with Bartenbach. Bartenbach gave birth to A.B. on August 14, 2006. Bartenbach contacted Hartley shortly after the birth and asked him to come and meet his child.  Hartley began visiting regularly Bartenbach at her home in Destin, Florida, following the birth. Beginning in January 2007, Hartley and Bartenbach moved in together, and he provided support for her and the young child. Also during this time, Bartenbach became pregnant with a second child by Hartley.

¶4.     Earlier in 2006, Hartley had had a sexual encounter with a fourteen-year-old girl whom he met online and invited to his house. After the girl reported the incident to her parents, an investigation began that lasted until August 16, 2006, when Hartley was arrested. In January 2007, the State of Florida offered a plea deal in which Hartley would plead *nolo contendere* to a charge of lewd and lascivious battery with a person over twelve but under

sixteen years of age and serve only two years in prison with four years' probation. Hartley accepted the deal and in April 2007, Hartley pleaded no contest and received a two-year prison sentence.

¶5. While he was incarcerated, Hartley was discharged from the Air Force under less than honorable circumstances. During this time, Bartenbach took A.B. to visit Hartley in prison a couple of times. Hartley claims that, before he was incarcerated, he left Bartenbach money in a checking account as support but could not recall the exact amount. Hartley also testified that Bartenbach and A.B. stayed in the apartment they had lived in together for about two months before he was incarcerated. On November 26, 2007, B.H. was born out of wedlock to Bartenbach. Following this event, visits to the prison were no longer feasible. In February 2008, Bartenbach and the two children moved to Ocean Springs, Mississippi.

¶6. Prior to being released from prison, Hartley was required to provide Florida probation authorities with proof of residence and employment and register as a sex-offender. Since Bartenbach had moved to Mississippi and had begun to sever ties to Hartley and his family, Hartley decided he would return to Pennsylvania, where he had family ties. On January 2, 2009, Hartley was released from prison and moved in with his grandfather in Pennsylvania. Hartley testified that he worked as an electrician with his uncle as soon as he arrived in Pennsylvania and eventually found full-time employment with Timberline Packaging around February 2009.

¶7. Following his release, Hartley maintained phone contact with his children as much as he could, given Bartenbach's animosity toward him. In August 2009, the minor children

3

were taken into custody by Jackson County Department of Human Services. Hartley sought custody of his children but could not attend court in Jackson County as a result of his probation. In addition to hiring counsel to represent him in the youth court, he paid for a DNA test to prove paternity. Hartley also invoked the Interstate Compact on the Placement of Children (ICPC) which would allow his children to be placed with him out of the State of Mississippi. He also sought visitation rights. However, he was denied both. Bartenbach never sought custody of her children after they were removed and eventually signed a Surrender of Parental Rights form on January 17, 2013, and termination of her parental rights was ordered on June 2, 2014.

¶8.    In December of 2009, A.B. and B.H. were placed with foster parents, Lenita and John Watts, in Lincoln County, Mississippi. The Wattses provided care for the children for twenty-two months from approximately December 2009 to October 2011. The Wattses received no support from Hartley or Bartenbach during this period and decided within the first six months of the placement that they would pursue adoption. Following their unexpected and unexplained removal from the Wattses' home, the children were placed in at least four other foster homes and, in at least one of these, allegations of sexual abuse were raised.

¶9.    In January of 2010, Hartley was incarcerated for violating his probation on two counts, (1) curfew violation and (2) unsupervised contact with minors. Following his arrest, he was extradited to Florida, where he pleaded guilty. In September that same year, he was released from prison and returned to Pennsylvania. Shortly thereafter, on September 13, 2010, the Jackson County Youth Court ordered the Department of Human Services to stop

working with the parents and to proceed with the termination of parental rights. At this hearing, Hartley again asked for visitation, custody, or ICPC rights, but all requests were denied.

¶10.    The Department of Human Services filed a petition to terminate the parental rights of both Hartley and Bartenbach in May 2011. Despite the testimony of three social workers, the guardian ad litem, and Dr. Donald G. Hoppe, all recommending termination of parental rights, on June 20, 2011, the Jackson County Youth Court changed positions and ordered reunification efforts with Hartley.

¶11.    In October 2011, the Jackson County Youth Court granted Hartley full custody of the children. However, the Lincoln County Chancery Court granted the Wattses' Temporary Injunctive Relief, staying any change in custody. *Miss. Dep't of Human Servs. v. Watts*, 116 So. 3d 1056, 1057 (Miss. 2012).That same month, the Wattses filed their petition for termination of parental rights, adoption, or in the alternative custody, and for other relief in Lincoln County Chancery Court. Following the Mississippi Supreme Court's ruling on an interlocutory appeal, to determine whether the Lincoln County Chancery Court had jurisdiction, the case was remanded to the Lincoln County Chancery Court for a trial on the merits. *Id.*

¶12.    Between 2011 and 2014, Hartley had intermittent contact with his children through phone calls and Skype. Hartley also spent a total of twenty-seven days and nine hours with his children through visits spanning from June 21, 2011, through March 15, 2014.

¶13.    Trial began on April 29, 2014, and lasted four days. At trial, the Wattses called the following witnesses: Mark Holmes (Guardian Ad Litem), Hartley (Respondent), Lena Parker (DHS Supervisor), Lasonga Fields (DHS Resource Specialist), and Lenita Watts (Petitioner). Hartley called the following witnesses: Ellen Moore (therapist at Family Focus PLLC), Lakeshia Kinnard-Ellis (DHS Family Protection Specialist), Stephanie Stanton (DHS Adoption Specialist), Lindsay Teague (DHS Social Worker), Martha Hartley (Respondent's Mother), and Hartley (Respondent). Following the testimony of the other witnesses, the guardian ad litem, Mark Holmes, testified regarding his final report and recommendation that parental rights be terminated for both Hartley and Bartenbach. The Interlocutory Decree was entered on June 19, 2014, in favor of the Wattses' position, terminating Hartley's parental rights and allowing A.B. and B.H. to be adopted over the objection of a nonconsenting parent. Following a six-month interlocutory period, the adoption became final on December 23, 2014.

¶14.    After the denial of his request for reconsideration, Hartley timely filed this appeal on January 23, 2015, raising the following issues: first, whether the Chancery Court of Lincoln County erred in terminating the parental rights of Frank Hartley Jr.; and second, whether the Chancery Court of Lincoln County erred in failing to address the three prerequisites for termination of parental rights that must be met under Subsection (1) of Mississippi Code Section 93-15-103.

**STANDARD OF REVIEW**

¶15.    In termination-of-parental-rights cases, the Mississippi Supreme Court examines "whether credible proof exists to support the chancellor's finding of fact by clear and convincing evidence." *W.A.S v. A.L.G.*, 949 So. 2d 31, 34 (Miss. 2007) (citing *K.D.F. & J.C.F. v. J.L.H.*, 933 So. 2d 971, 975 (Miss. 2006)). Further, the chancellor's findings of fact "are viewed under manifest error/substantial credible evidence standard of review." *Id.* However, the Court will not substitute its judgment for the chancellor's. *Id.*

## DISCUSSION

### I.    Whether the Lincoln County Chancery Court erred in terminating the parental rights of Frank Hartley Jr.

¶16.    The Wattes sought termination of parental rights pursuant to Mississippi Code Section 93-17-7 (Rev. 2013), which allows the adoption of a child over the objection of a nonconsenting parent upon a finding by the chancellor of certain enumerated factors. The chancellor's decision to terminate parental rights was based on four findings: A. Moral unfitness; B. Failure to provide support; C. Past and present conduct; and D. Acts and omissions under Section 93-15-103.

### A.    Whether the chancery court erred in determining that the moral unfitness standard had been met by clear and convincing evidence.

¶17.    Hartley argues that the Wattses failed to overcome the strong presumption in favor of a natural parent retaining parental rights. *In Re Adoption of H.H.O.W.*, 109 So. 3d 1102 (Miss. Ct. App. 2013). The party seeking the adoption and termination of parental rights must prove by clear and convincing evidence that the objecting party is "mentally, or morally, or otherwise unfit to rear and train [his child]." Miss. Code Ann. § 93-17-7(1) (Rev. 2013); *see*

7

*also* ***In Re Adoption of H.H.O.W.***, 109 So. 3d 1102 (Miss. Ct. App. 2013). Hartley disputes each of the factors on which the chancery court relied to support the termination of parental rights. The chancellor cited each of the following findings in determining that Hartley was morally unfit.

### i.        Sex-Offender Status

¶18.    Hartley is a convicted sex-offender who is required to register for life. He was convicted under Florida law for lewd and lascivious battery against a fourteen-year-old girl.[2] The chancellor found that this fact would affect adversely the children's social and extracurricular engagements. Hartley argues on appeal that his criminal conviction is inadequate alone to support the termination, citing ***In Interest of J.D.***: "commission of a crime is, alone, insufficient to find him morally unfit to rear and train his child, especially where rehabilitation is evident." ***In Interest of J.D.***, 512 So. 2d 684, 686 (Miss. 1987) (affirming the trial court's finding that the parent was fit). In the present case, the chancellor found that the criminal conviction, along with other factors delineated below, did render Hartley unfit and, absent manifest error, we will not disturb that determination.[3]

¶19.    Hartley also states that the chancellor incorrectly relied on a criminal conviction that happened in the past. However, the version of Mississippi Code Section 93-17-7(2)(d) that was in effect at the time the Wattses' petition was filed permitted the chancellor to consider

---

[2]Fla. Stat. Ann. § 800.04(4) (2014). *See also* ***State of Florida v. Frank A. Hartley***, Case # 06-CF-2161 (Okaloosa County Circuit Court).

[3] The chancellor also noted that when Hartley was released from prison on January 2, 2009, he stated that he was required to register his sex-offender status in Pennsylvania within forty-eight hours. The record indicates that he did not do this until January 20, 2009.

"(d) viewed in its entirety, the parent's past or present conduct, including his criminal convictions," when granting an adoption over a parent's objection.[4]

---

[4]Mississippi Code Section 93-17-7 was amended in 2016. Because the proceedings occurred in 2014, this Court will view the version of the statute as it existed in 2014. Mississippi Code Section 93-17-7 (Re. 2013) states:

(1) No infant shall be adopted to any person if either parent, after having been summoned, shall appear and object thereto before the making of a decree for adoption, unless it shall be made to appear to the court from evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, those matters set out in subsection (2) of this section, in either of which cases the adoption may be decreed notwithstanding the objection of such parent, first considering the welfare of the child, or children sought to be adopted. Provided, however, the parents shall not be summoned in the adoption proceedings nor have the right to object thereto if the parental rights of the parent or parents have been terminated by the procedure set forth in Sections 93-15-101 through 93-15-111, and such termination shall be res judicata on the question of parental abandonment or unfitness in the adoption proceedings.

(2) An adoption may be allowed over the objection of a parent where:
        (a) The parent has abused the child. For purposes of this paragraph, abuse means the infliction of physical or mental injury which causes deterioration to the child, sexual abuse, exploitation or overworking of a child to such an extent that his health or moral or emotional well-being is endangered.
        (b) The parent has not consistently offered to provide reasonably necessary food, clothing, appropriate shelter and treatment for the child. For purposes of this paragraph, treatment means medical care or other health services provided in accordance with the tenets of a well- recognized religious method of healing with a reasonable, proven record of success.
        (c) The parent suffers from a medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse or chemical dependency which makes him unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.

9

### ii. Adulterous Relationships and Fathering Children Out-of-Wedlock

¶20. It is undisputed that Hartley engaged in adulterous relationships with at least two different women and fathered both A.B. and B.H. out of wedlock. The first relationship with Bartenbach ended his own first marriage. The second adulterous relationship, with Kathryn Kistler, ended her marriage. Hartley argues on appeal that his adulterous relationships alone do not support the termination. Hartley cites ***Petit v. Holifield***, where this Court found "the fact that a custodial parent has cohabitated with a person who later became that parent's spouse [is] insufficient to constitute a material change in circumstances requiring a change in custody." ***Petit v. Holifield***, 443 So. 2d 874, 878 (Miss. 1984). The Court then stated that this is true also in adoption cases. ***Id.*** The Court continued, "[t]he mere fact that a natural parent has had a prior adulterous relationship is insufficient to warrant a finding that the parent is unfit under our statutes whereby his parental rights may be severed." ***Id.***

¶21. In this case, Hartley began his relationship with Bartenbach before he was divorced from his first wife. He also began his relationship with Kistler, his current wife, while she

---

(d) Viewed in its entirety, ***the parent's past or present conduct, including his criminal convictions***, would pose a risk of substantial harm to the physical, mental or emotional health of the child.
(e) The parent has engaged in acts or omissions permitting termination of parental rights under Section 93-15-103.
(f) The enumeration of conduct or omissions in this subsection (2) in no way limits the court's power to such enumerated conduct or omissions in determining a parent's abandonment or desertion of the child or unfitness under subsection (1) of this section. (Emphasis added.)

was still married, ending that marriage. These events, together with the sexual battery, support the chancellor's decision.

### iii.  Candor Before the Courts

#### a. Youth Court

¶22.    The chancellor found that Hartley had little regard for the truth when testifying before the Jackson County Youth Court, where it is alleged that he misrepresented the facts of the sexual battery of the fourteen-year-old. Hartley argues that he never misrepresented those facts to the youth court. However, Lenita Watts testified that Hartley, while under oath, testified to the Jackson County Youth Court that he had met the fourteen-year-old at a bar and that she had a fake ID and that it was the bouncer's fault for letting her in.  Stephanie Stanton, an adoption specialist with DHS, testified that she also remembered Hartley making a similar explanation, but she did not remember him passing blame to the bouncer.

¶23.    The record supports the chancellor's finding that Hartley misrepresented the facts of his sexual-battery conviction before the youth court.[5]

#### b. Chancery Court

¶24.    The chancellor found that Hartley had made misrepresentations to the chancery court regarding when he began cohabitating with his current wife. Hartley does not take issue with

---

[5]Hartley also complains of what he refers to as other falsehoods, allegedly disseminated through DHS, such as he was convicted of child pornography.  Lena Parker, a supervisor with Department of Human Services (DHS), testified that DHS likely was responsible for the dissemination of the falsehoods rather than Hartley.  The record shows that this was introduced through a social worker's aid to one of the other social workers who counseled the children. The chancellor did not rely on these other alleged falsehoods in his decision.

that but says that the activity did not affect his children, since they were not present. He also argues that cohabitation is relevant only where it adversely affects the children. ***Glissen v. Glissen***, 910 So. 2d 603, 611-12 (Miss. Ct. App. 2005); *see also* ***Cheek v. Ricker***, 431 So. 2d 1139, 1144 (Miss. 1983). The record supports the chancellor's finding of lack of honesty and candor by Hartley before the chancery court.[6]

### iv. Probation Violation

¶25. The chancellor found that violating probation was evidence of his moral unfitness. Hartley claims he was innocent of violating his probation, yet he pleaded guilty and was incarcerated. Hartley also argues that the chancellor should not apply Mississippi Code Section 93-17-7 to the fact that he pleaded guilty to his probation violation. However, the statute gives the chancellor broad discretion in subsection (f) to determine what conduct may be considered for a finding of unfitness.[7]

### v. Current Wife's Loss of Custody

---

[6]The chancellor also found the following regarding Hartley's testimony:

> Hartley represented to this court that the children were most distressed when he obtained them in October 2011, while the social worker testified they were happy. This Court chooses to find the social worker more credible. There are other incidents in this record that call Hartley's credibility in issue and when taken in view of the totality of circumstances cause this Court to find that the moral unfitness standard has been met. This is by clear and convincing evidence.

[7]Mississippi Code Statute 93-17-7(2)(f) states, "The enumeration of conduct or omissions in this subsection (2) in no way limits the court's power to such enumerated conduct or omissions in determining a parent's abandonment or desertion of the child or unfitness under subsection (1) of this section."

¶26. The chancellor found that Hartley had maintained a relationship with a married woman, Kathryn Kistler, and caused her to lose custody of her children due in part to his status as a sex-offender. He also found that the Pennsylvania court forbade any contact between Hartley and Kistler's children. Hartley presents a similar argument here as before and suggests that since A.B. and B.H. were not involved, they were not harmed. However, there is a distinction that should be noted. The relationship with the married woman in Pennsylvania resulted in Hartley's violation of probation and her losing custody of her three children. The chancellor cited this factor to demonstrate Hartley's moral unfitness, as the relationship had consequences that went beyond the promiscuity. Hartley contends that the relationship resulted in marriage and was out of the presence of his children and therefore was not adverse to them. However, the extramarital affair, resultant probation violation, and subsequent incarceration demonstrate moral unfitness and support the chancellor's finding.

### vi. Choice to Remain in Pennsylvania

¶27. Hartley chose to remain in Pennsylvania rather than move to Mississippi where his children were located, shirking all responsibility for their support. Hartley contends that staying in Pennsylvania was the best decision for him and his children. In addition to having family support there, he also had stable living conditions and employment. Hartley contends that nothing in the statutes or caselaw supports finding a parent unfit for living in a different state. This Court has stated that "a custodial parent may wish to take his or her child out of the state [and doing so] is [an] insufficient reason to deprive the parent of custody . . . ." *White v. Thompson*, 569 So. 2d 1181, 1184 (Miss. 1990). Hartley is not the custodial parent

in this case, but the caselaw supports his contention that nothing would preclude him from moving his children to Pennsylvania if he had custody and had no restrictions from the court that granted custody.

¶28. The chancellor correctly notes that Hartley's choice to move away from the children without seeking custody was adverse to the best interests of the children and constituted evidence against the father.[8] Further, Department of Human Services recommended that Hartley move closer to facilitate reunification efforts.

**B. Whether the chancery court erred in determining that Hartley failed to provide support by clear and convincing evidence.**

¶29. The failure to provide support is another basis for termination under Mississippi Code Section 93-17-7. An adoption over the parent's objection may be ordered where "the parent has not consistently offered to provide reasonably necessary food, clothing, appropriate shelter and treatment for the child." Miss. Code Ann. § 93-17-7(2)(b) (Rev. 2013). The chancellor noted that the Department of Human Services never asked Hartley to contribute to the support of his children.

¶30. Hartley contends that his persistent requests for custody throughout this whole process support his willingness to provide for his children. He also points out that, prior to his incarceration and for a short time after, he provided all the necessary support for A.B. and that he did not abandon his children. The chancellor found, and the record supports, that

---

[8]The guardian ad litem stated that the youth court had authority to place the children with Hartley had he moved to Mississippi.

14

Hartley consistently shirked any responsibility for providing support and never offered to provide support to his children.[9]

> **C. Whether the chancery court erred in determining by clear and convincing evidence that Hartley's past and present conduct is grounds for terminating parental rights.**

¶31. Hartley argues that the chancellor erred in finding that Mississippi Code Section 93-17-7 allows it to consider past conduct. However, the applicable version of the statute allows for such an analysis and states: "An adoption may be allowed over the objection of a parent where . . . [v]iewed in its entirety, the parent's *past or present conduct*, including his criminal convictions, would pose a risk of substantial harm to the physical, mental or emotional health of the child." Miss. Code Ann. § 93-17-7(2)(d) (Rev. 2013) (emphasis added). Many of the factors set out in subsection A detail Hartley's conduct.

¶32. Hartley argues that the chancellor's assessment of his conduct gives no credit to the fact that he has been fighting for custody of his children for almost six years. He also contends that he has, through phone calls, Skype, and visits, developed relationships with A.B. and B.H. following the youth court's order of reunification efforts in 2011.[10] While this is not relevant in determining the adverse effect Hartley's past and present conduct might have on the children, he seems to be arguing that his behavior has improved.

---

[9]The chancellor focused on the language of the statute which requires "offer[s] to provide," not actual providing.

[10]The youth court ordered monitored telephonic visitation, including the use of Skype, beginning in June 2011. Lenita Watts testified that she complied with the court's order but Hartley would occasionally miss these visits.

¶33. The chancellor found that the children were adversely affected and were deprived of their biological father as a result of Hartley's conduct. Additionally, the record supports the chancellor's finding that, as a result of his conduct, Hartley had little contact with his children from 2007 to 2011. The chancellor also found that it is unlikely that a handful of visits since 2011 could have created a father-child relationship after such a long absence. The chancellor also found that Hartley's past and present conduct would pose a risk of substantial harm to the physical, mental, and emotional health of the children. The chancellor considered the effect of Hartley's status as a sex-offender. He found that the social, extracurricular, and other activities of the children will be impaired by Hartley's status as a registered sex-offender and found that this was clear and convincing evidence of risk of substantial harm to the children.

> **D. Whether the chancery court erred in determining that Hartley's acts or omissions allowed termination of parental rights under Section 93-15-103.**

¶34. Mississippi Code Section 93-17-7 permits the chancellor to base his decisions on acts or omissions under the termination-of-parental-rights statute, Mississippi Code Section 93-15-103 (Rev. 2013).[11] Subsection (3)(f) of Section 93-15-103 provides for terminating parental rights where there is sustained separation and lack of communication that undermines the relationship between the parent and child, stating:

> When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other ***substantial erosion*** of the relationship between the parent and child which was caused at least in part by the parent's

---

[11]A 2016 amendment of Section 93-15-103 removed the bulk of that section to Section 93-15-121.

serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment.

Miss. Code Ann. § 93-15-103(3)(f) (Rev. 2013) (emphasis added). The Court has noted that "[a] finding of substantial erosion of the parent/child relationship necessarily involves a consideration of the relationship as it existed when the termination proceedings were initiated." *G.Q.A. v. Harrison County Dep't of Human Res.*, 771 So. 2d 331, 338 (Miss. 2000). The chancellor noted that no relationship existed at the beginning of the proceedings in 2011 and that it had not been eroded through any animosity between parent and children.

¶35.    This Court also has held that a "substantial erosion could be prove[n] by showing a prolonged absence and lack of communication between the parent and child."*Id.* The statute, referenced above, states as much: "[B]y the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment." Miss. Code Ann. § 93-15-103(3)(f). The chancellor found the following facts were clear and convincing evidence of an erosion of the relationship: Hartley's (1) failure to send any monetary support, (2) failure to take steps to notify authorities of suspected neglect of his children by Bartenbach, (3) failure to seek an adjudication of paternity and the rights and obligations associated with that determination, (4) failure to establish contact with the children during the time he was first released from prison, specifically from January 2, 2009, through January 27, 2010, (5) multiple incarcerations, (6) deliberate choices to locate a great distance from the children during the period of his probation, and (7) that at the time the petition was filed, the children simply did not know who he was.

¶36.   The chancellor stated further, "[i]t is virtually incomprehensible to believe a father-child relationship, after the extended absence since [A.B.] was an infant and complete absence in the case of [B.H.], could be re-established with twenty-seven days and [nine] hours of physical contact coupled with Skype and phone contact."[12]

¶37.   Hartley argues that he was not allowed to communicate with his children until June 20, 2011. But after he was allowed to communicate, he did so consistently. He argues that where a parent has made efforts to maintain a relationship, termination of parental rights is error. *De La Oliva v. Lowndes County Dep't of Pub. Welfare*, 423 So. 2d 1328, 1331-32 (Miss. 1982). He also cites this case to also show that error exists where DHS fails to work with the parents and a third party intervenes. *Id.* Hartley claims that the record clearly supports the notion that the Wattses interfered in his attempts to gain custody of his children. However, the record shows that, because the youth court had not ordered reunification efforts with Hartley, DHS had refused to work with him. Nothing suggests that the Wattses caused the problems. And after the youth court ordered reunification efforts with Hartley in 2011, DHS began working with him.

¶38.   Another subsection of Mississippi Code Section 93-15-103(3)(g) allows for termination of parental rights where the parent has violated certain statutes. That subsection provides the following ground, justifying termination of parental rights:

---

[12]The chancellor is referring to the period of time following Hartley's incarceration in 2007 to 2011 when the children either were with their mother, Bartenbach, or in foster care and did not see their father. Hartley testified that he did make regular phone calls to his children after getting out of prison and during the reunification efforts beginning in 2011.

18

When a parent has been convicted of any of the following offenses against any child: (i) rape of a child under the provisions of Section 97-3-65, (ii) sexual battery of a child under the provisions of Section 97-3-95(c), (iii) touching a child for lustful purposes under the provisions of Section 97-5-23, (iv) exploitation of a child under the provisions of Section 97-5-31, (v) felonious abuse or battery of a child under the provisions of Section 97-5-39(2) . . . .

Miss. Code Ann. § 93-15-103(3)(g) (Rev. 2013). The chancellor readily acknowledged that Hartley was not convicted of a violation of a Mississippi statute since the crime occurred in Florida. However, Hartley's Florida crime has the same elements as the Mississippi crimes "touching a child" and "statutory rape." Miss. Code Ann. §§ 97-5-23 (Supp. 2016) & 97-3-65 (Rev. 2014). The chancellor found that this factor was proved with clear and convincing evidence.

¶39. However, Hartley contends that, since the crime was committed in Florida, he is exempt from that consequence. Hartley argues that if the Legislature had intended to allow out-of-state convictions to apply, it should have made that clear in the statute. Hartley is correct that the statute references violations of Mississippi statutes. *See* Miss. Code Ann. § 93-15-103(3)(g) (listing specific Mississippi Code sections rather than general crimes.) However, the chancellor's decision was made under Section 93-17-7, and Section 93-15-103(3)(g) was invoked only as an additional factor under Section 93-17-7(e). That the Florida criminal judgment would not support a termination under Mississippi Code Section 93-15-103(3)(g) does not cause the ultimate holding to fail.

**II.      Whether the Lincoln County Chancery Court  erred in failing to address the three prerequisites that must be met under Subsection (1) of Mississippi Code Section 93-15-103.**

19

¶40. Hartley argues that the chancellor failed to consider all the prerequisites under Mississippi Code Section 93-15-103(1) before terminating parental rights, as required by *Chism v. Bright*, 152 So. 3d 318 (Miss. 2014). *Chism* requires the trial court to address three factors under Section 93-15-103(1), including: (1) The child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time or the parent is unable or unwilling to care for the child; (2) relatives are not appropriate or are unavailable; and (3) adoption is in the best interest of the child. *Id.* (citing *In Re Dissolution of Marriage of Leverock and Hamby*, 23 So. 3d 424, 428 (Miss. 2009)).

¶41. As to the first prong, it is undisputed that Hartley sought custody after the reunification efforts were ordered by the court. Reunification efforts began with Hartley after the children were in DHS's custody for two years. Hartley contends that he made countless efforts to get custody of his children. The Wattses respond that these prerequisites were not ignored at trial and that when the children were taken into DHS's custody, neither parent was available, as Bartenbach was neglecting the children and Hartley was in prison. The record supports their contention that Bartenbach was unavailable. However, the record shows that Hartley was released from prison in January 2009, about eight months before the children were taken into custody. The record supports his argument that he was not initially considered as an option after the children were taken into DHS's custody. The chancellor conceded that abandonment was not proven by clear and convincing evidence.

¶42.    Hartley next argues under prong two that other relatives were not considered. The record also supports Hartley's contention that, initially, DHS made very few efforts to place the children with his family and that Hartley's parents sought to have the children placed with them. The Wattses responded that relative placement was not viable. Their argument was based on the fact that Hartley's mother did not take immediate action and asked for visitation only five months after the children were taken into custody and requested custody only after about a year.

¶43.    Finally, with respect to prong three, Hartley contended that termination of parental rights should be the last resort. The Wattses argued that the chancellor found that adoption was in the best interests' of the children. They contend that this is supported by Guardian Ad Litem Mark Holmes's final recommendation. Indeed the chancellor found by clear and convincing evidence that the adoption was in best interests of the children.

¶44.    Hartley's argument ultimately fails because the chancellor's termination was based on Mississippi Code Section 93-17-7. This Court has held that the chancellor may also consider factors from Section 93-15-103 in termination-of-parental-rights cases. ***Blakeney v. McRee***, 188 So. 3d 1154, 1163-64 (Miss. 2016). In ***Blakeney***, this Court held that "[t]he statutory grounds for termination of parental rights in suits brought under Section 93-15-103 also are incorporated by reference as circumstances the chancellor may consider in determining whether to grant an adoption over the objection of a natural parent." ***Id.*** at 1163. This Court continued, "the chancellor is free to consider, but was not required to find, the statutory grounds enumerated in Sections 93-17-7 and 93-15-103." ***Id.*** at 1164. Since the chancellor ruled under Mississippi Code Section 93-17-7 in terminating parental rights, the

21

court was not required to consider all the prerequisites or factors under Section 93-15-103(1) and used that section only as additional support of his final judgment.

## CONCLUSION

¶45.    After a thorough consideration of the record and the chancellor's determination, we affirm the Lincoln County Chancery Court's judgment to terminate Frank A. Hartley Jr.'s parental rights and grant the adoption by John D. and Lenita S. Watts of A.B. and B.H.

¶46.    **AFFIRMED.**

**DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.**