# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00259-COA

| | |
|---|---|
| IN THE MATTER OF H.S., A MINOR:<br>TREVOR SMITH | APPELLANT |

v.

| | |
|---|---|
| HUNTER LOGAN MITCHELL AND JADE<br>FLURRY | APPELLEES |

| | |
|---|---|
| DATE OF JUDGMENT: | 02/15/2023 |
| TRIAL JUDGE: | HON. MICHAEL CHADWICK SMITH |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | S. CHRISTOPHER FARRIS |
| ATTORNEY FOR APPELLEES: | JANSEN T. OWEN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/25/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. Following a trial on February 1, 2023, in a ruling from the bench, the chancellor found that petitioners Jade Flurry and Hunter Logan Mitchell had "proven, by clear and convincing evidence, the grounds of abandonment and desertion" as defined by Mississippi Code Annotated section 93-15-103 (Rev. 2021) and terminated Smith's parental rights to H.S.[1] pursuant to Mississippi Code Annotated section 93-15-119 (Rev. 2021). On February 15, 2023, the Pearl River County Chancery Court entered a "Final Judgment Terminating Parental Rights of Trevor Smith." A transcript of the bench ruling was attached to and

---

[1] We use initials for the minor child's name to protect his/her identity.

incorporated into the final judgment. Smith appealed.

## FACTS AND PROCEDURAL HISTORY

¶2.     While Flurry and Smith were never married, they are the biological parents of H.S., who was born in 2015. Flurry became pregnant with H.S. when she was age sixteen and Smith was twenty. During her pregnancy, they lived with Smith's grandmother Sue.

¶3.     Smith was arrested when H.S. was one month old. On February 29, 2016, Smith pled guilty to burglary and felony fleeing in the Circuit Court of Pearl River County. For burglary, Smith was sentenced to seven years in the custody of the Mississippi Department of Corrections (MDOC) with five years to serve and two years of post-release supervision. He was also sentenced to five years in MDOC's custody for felony fleeing, with that sentence set to run concurrently with the sentence for the burglary.

¶4.     Flurry testified that she and Smith's family members took H.S. to visit Smith during his incarceration to "keep a relationship." According to Flurry, during the two years she lived with Sue after Smith went to jail, she did not have a relationship with Smith. At Sue's request, Flurry testified that she and H.S. moved out of Sue's home in April 2017. According to Flurry, Sue asked her to leave because of Flurry's relationship with Mitchell. Flurry and H.S. then moved in with Mitchell.

¶5.     Smith was released on May 10, 2018. For the first nineteen months of H.S.'s life, Smith was incarcerated for all but one month. After his release from custody, Smith went to live with his father David Smith and his wife Kandi. At that time, although there was no court order in place, Flurry and Smith shared custody of H.S., rotating every three days.

Flurry said that this situation continued through August 2018. In August 2018, Flurry met Smith at the ball field where they usually met to "switch with" H.S., and she thought Smith was on drugs. Smith admitted during his testimony that he may have been under the influence that day, but he could not recall. After that event, Flurry did not allow Smith to visit with H.S. for fear of his drug addiction.

¶6. Shortly after Flurry stopped Smith's visitation with H.S., Smith was incarcerated again on October 22, 2018, in Hancock County for felony possession of a controlled substance. On October 18, 2021, Smith pled guilty in Hancock County for receiving stolen property and possession of a controlled substance. He was sentenced to serve a total term of twenty years, with seventeen years suspended, leaving three years to serve followed by five years of reporting post-release supervision with any balance to be considered non-reporting post-release supervision. On March 1, 2022, Smith pled guilty to possession of a controlled substance in the Circuit Court of Pearl River County and was sentenced to serve three years in custody, and this sentence was ordered to be served concurrently with the Hancock County sentences. In addition to these convictions, the guardian ad litem's (GAL's) report shows that Smith was arrested several other times during this period for other charges, probation violations, and parole violations.

¶7. Flurry and Mitchell were married on May 24, 2021. On March 8, 2022, they filed their petition to terminate Smith's parental rights and to allow Mitchell to adopt H.S. At that time, Smith was incarcerated in the Hancock County Correctional Facility in Bay St. Louis. Their petition alleged that Smith had abandoned or deserted H.S. according to section 93-15-103

3

and that Smith was mentally, morally, or otherwise unfit to raise H.S. based upon his absence from the child's life. The petition further alleged that the termination of Smith's parental rights "is appropriate because future contacts between [Smith and H.S.] are not desirable toward obtaining a satisfactory permanency based on one or more factors in Miss. Code Ann. § 93-15-121." The petition noted that Smith had failed to financially support H.S. or maintain a relationship with him and had had no contact with H.S. for one year or more. According to the petition, Smith was "unable or unwilling to provide the reasonably necessary food, clothing, shelter, or medical care for H.S. pursuant to Miss. Code Ann. § 93-15-119." The petition also argued that Smith's failure to exercise reasonable visitation with H.S. caused a "substantial erosion of the relationship between parent and child" and that it was in the child's best interest for Smith's rights to be terminated.

¶8. In the petition, Mitchell also sought to officially change H.S.'s surname to Mitchell, asking that the Mississippi Department of Health and Human Resources Vital Records Registry amend H.S.'s birth certificate to reflect his surname as Mitchell, with his first and middle names remaining the same. The Mississippi Attorney General, through her office, was duly served with a copy of the petition on March 21, 2022. On April 7, 2022, the attorney general filed an answer on behalf of the Mississippi State Board of Health asking that the relief requested be denied "unless proof satisfactory to the Court is presented." The petition requested the appointment of a GAL.

¶9. On May 12, 2022, the chancellor entered a temporary order appointing Shelby Harper

4

as the GAL[2] and granted temporary legal and physical custody of H.S. to Flurry and Mitchell, granted Smith thirty days to obtain representation, provided for payment of Smith's child support arrearage,[3] and suspended Smith's ongoing child support obligation until further order of the court.[4]

¶10.   Harper filed her report on January 31, 2023, and trial commenced on February 1, 2023. Flurry, Smith, Mitchell, Kandi, Sue, and Harper testified at trial. After hearing all the testimony, the judge issued a bench ruling terminating Smith's parental rights and issued a written order on February 15, 2023.[5]

## STANDARD OF REVIEW

¶11.   We explained the standard of review in cases where parental rights have been terminated in *Rogers v. Kresse*, 365 So. 3d 1047, 1051 (¶14) (Miss. Ct. App. 2023):

---

[2] Harper was appointed "to represent the best interest of [H.S.] . . ., to investigate and ascertain the facts, and to make a recommendation to this Court as to what is in the best interest of [H.S.].

[3] An "Agreed Judgment for Support and Other Relief" had been entered on February 8, 2021.

[4] According to the temporary order, a hearing was conducted, and Flurry and Mitchell appeared with counsel. Smith was also present, announcing his intentions to hire counsel, and the Mississippi Department of Health, being represented by counsel, announced the financial status of a pending child support collections case. The transcript of that hearing is not part of our record on appeal. Smith was ordered to pay $150 per month in child support in January 2021.

[5] During the February 1, 2023, trial the chancellor was presented with a "Complaint for Grandparent Visitation" filed by Smith's father David, which was consolidated with the petition for termination of parental rights and adoption. In his order terminating Smith's parental rights, the chancellor continued David Smith's complaint. That complaint is not at issue in this appeal. A ruling on Mitchell's petition for adoption was held in abeyance until this appeal is resolved.

"In cases where parental rights have been terminated, our scope of review is limited." *Smith v. Doe*, 314 So. 3d 154, 162 (¶26) (Miss. Ct. App. 2021) (citing *Little v. Norman*, 119 So. 3d 382, 385 (¶12) (Miss. Ct. App. 2013)). "In termination-of-parental-rights cases, [an appellate court] examines 'whether credible proof exists to support the chancellor's finding of fact by clear and convincing evidence.'" *Hartley v. Watts*, 255 So. 3d 114, 118 (¶15) (Miss. 2017) (quoting *W.A.S. v. A.L.G.*, 949 So. 2d 31, 34 (¶7) (Miss. 2007) (citing *K.D.F. v. J.L.H.*, 933 So. 2d 971, 975 (¶14) (Miss. 2006))). The "chancellor's findings of fact are viewed under [the] manifest error/substantial credible evidence standard of review." *Id.* This "Court will not substitute its judgment for the chancellor's." *Id.* (internal quotation marks omitted).

## ANALYSIS

¶12. On appeal, Smith contends that Flurry "failed to provide clear and convincing evidence sufficient to support termination of [his] parental rights to . . . [H.S.]." He argues that the only thing Flurry proved by clear and convincing evidence at trial was that Smith had been "in and out of jail for the last 7 years." While he argues that Smith had regular visitation with H.S. "before, during and after all periods of incarceration," the record simply does not support his contention. Citing two cases that are factually dissimilar to the present case, Smith concludes that "[T]here was insufficient evidence other than incarceration alone to support terminating [his] parental rights to . . . [H.S.]." We disagree.

¶13. The statutory requirements for the involuntary termination of parental rights are set forth in section 93-15-119, which reads in part:

(1) A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, **the court finds by clear and convincing evidence**:

(a)(i) **That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103**, or is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present

6

conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and

(ii) **That termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome;**

(Emphasis added). Abandonment and desertion are defined in section 93-15-103 as follows:

(a) "Abandonment" means any conduct by the parent, whether consisting of a single incident or actions over an extended period of time, that evinces a settled purpose to relinquish all parental claims and responsibilities to the child. **Abandonment may be established by showing**:

(i) For a child who is under three (3) years of age on the date that the petition for termination of parental rights was filed, that the parent has deliberately made no contact with the child for six (6) months;

(ii) **For a child who is three (3) years of age or older on the date that the petition for termination of parental rights was filed, that the parent has deliberately made no contact with the child for at least one (1) year**;

. . . .

(d) "Desertion" means:

(i) Any conduct by the parent over an extended period of time that demonstrates a willful neglect or refusal to provide for the support and maintenance of the child; or

(ii) **That the parent has not demonstrated, within a reasonable period of time after the birth of the child, a full commitment to the responsibilities of parenthood**.

(Emphasis added).

¶14.    The testimonies of both Flurry and Smith were clear that Smith had been incarcerated,

7

off and on, for most of H.S.'s life. After Smith was released from prison in May 2018, Flurry and Smith shared custody of H.S. and would exchange custody every three days. However, that arrangement ended in August 2018 when Furry suspected that Smith was high on drugs when they met to exchange custody. After that event, Flurry would not allow Smith to visit with H.S. until he "cleaned up." Smith admitted that he could not remember if he was on drugs that day. In any event, Smith was taken back into custody in October 2018 on a drug charge.

¶15.    At trial, Smith was in custody in Hancock County. He admitted that he had four felony convictions and had a pending burglary indictment in Forrest County. He further admitted that he had been in jail about five of the last seven years. Smith told the chancellor that he had not had any interaction with H.S. since the child was three years old.[6] Smith testified that H.S. does not know him and that they have no relationship. He told the court that his pattern of "drug use, incarceration, drug use and incarceration" started before H.S. was born. He admitted that this pattern was "not good for [H.S.] to be around" and testified that this pattern of behavior affects H.S. in "a negative way." While Smith admitted that he had not paid child support, he stated that his family had made child support payments. He asked the court to not terminate his parental rights because he was then trying to be better.

¶16.    In addition to his incarcerations, Smith testified that he has been in rehabilitation facilities three times. He was first involuntarily committed by his father to Mississippi State Hospital for drug addiction before H.S.'s birth. He was there for one month. He also

---

[6] At the time of trial, H.S. was seven years old.

voluntarily committed himself to Teen Challenge but did not complete the program because he testified that "it wasn't a good environment." He was court-ordered to New Orleans Mission, another rehabilitation facility, but he also failed to complete the program there. Although he voluntarily left New Orleans Mission, Smith's testimony reveals that there were no consequences for his violation of the court order.

¶17.    The GAL (Harper) filed her report and testified at trial. She recommended that the court terminate Smith's parental rights based upon the statutes and her finding that it was in the best interest of the child. She reported clear evidence that Smith had no contact with H.S. for over one year. While early in H.S.'s life, Smith had been able to maintain a "semblance of father-[child] relationship . . . ultimately, patterns of behavior, the drug addiction, the criminal history, and the popping in and out of the child's life ultimately hindered him to be able to have that relationship." Harper found that based on the testimony of the family, there were more than a few chances for Smith to "get out, make better choices, make healthier choices, turn [his] life around and participate as a father, and unfortunately, it didn't happen." Harper further testified that "future contacts are not desirable due to the instability." She concluded that it was in H.S.'s best interest for the court to move forward with the termination of Smith's parental rights.

¶18.    After hearing and considering the testimony at trial, the chancellor terminated Smith's parental rights. There was clear and convincing evidence, based upon Smith's own testimony, that his pattern of "drug use, incarceration, drug use, incarceration" had caused him to have no relationship with H.S. and that there had been no contact or interaction

9

between him and H.S. since the child was three years old, a period of almost four years. The chancellor further found that Smith had exhibited no conduct to demonstrate that he was committed to the responsibilities of parenthood. Thus, the chancellor found clear and convincing evidence of both abandonment and desertion as defined by section 93-15-103. Finally, the chancellor found that it was in H.S.'s best interest to have no contact with Smith moving forward and that termination of Smith's parental rights was appropriate.

## CONCLUSION

¶19. We find substantial credible evidence to support the chancellor's decision to terminate Smith's parental rights. The chancellor was clear that Smith's history of incarceration alone did not dictate his findings. Instead, it was Smith's drug addiction, incarceration (usually as a result of drug use), and failure to establish and maintain a relationship with his child over the course of H.S.'s life that supported the termination of his parental rights.

¶20. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**