# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-00884-SCT

*IN THE INTEREST OF A MINOR VICTORIA
DENISE WAITES: JEFFREY SCOTT WAITES*

*v.*

*AMY MARIE WAITES RITCHIE AND
TIMOTHY J. SANFORD*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 03/21/2012 |
| TRIAL JUDGE: | HON. JOHNNY LEE WILLIAMS |
| TRIAL COURT ATTORNEYS: | WILLIAM L. PEEBLES |
| | ROBERT R. MARSHALL |
| | GEORGE H. GUNTER |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | S. CHRISTOPHER FARRIS |
| ATTORNEYS FOR APPELLEES: | GEORGE H. GUNTER |
| | ROBERT R. MARSHALL |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED - 12/11/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1. This appeal stems from a petition made by Amy Waites Ritchie ("Amy") to modify

a custody agreement created by Jeffrey Scott Waites ("Scott") and herself following their

divorce two years earlier.[1] Amy petitioned for modification, seeking to move with her two children to Iowa, as Amy planned to remarry there. Although Amy and Scott had agreed to joint physical and legal custody, Amy's proposed move to Iowa would make the provisions of the agreement unworkable. After initiating the petition, Amy contacted T.J. Sanford ("T.J.") to let him know she believed him to be her eldest child's biological father; subsequently, a DNA test proved T.J.'s paternity and he joined the matter seeking custody.

¶2. After excluding Scott from consideration under *Albright*[2] as a non-natural parent, the presiding chancellor awarded full physical and legal custody to Amy rather than T.J. The chancellor allowed visitation for both Scott and T.J., with respect to the eldest child. Scott appealed the court's order, and the Court of Appeals reversed. Finding Scott's fatherly actions did rebut the natural-parent presumption afforded to Amy and T.J., the Court of Appeals found Scott should have been considered on equal footing with the natural parents.

---

[1]This case previously was designated confidential in error, and after approval from all parties at oral argument before this Court, the matter is now no longer styled as such. In the Court of Appeals' opinion below Amy was referred to as "Anne," Scott was "Jake," T.J. was "Tommie," Victoria was "Vanessa," and Brackston was "Brett." *See **J.S.W. v. A.W.S. and T.J.S.**,_ So. 3d _, 2013 WL 6231797.

[2]*See **Albright v. Albright**, 437 So. 2d 1003, 1005 (Miss. 1983) ("We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.")

The Court of Appeals remanded this case to the chancery court with instructions to consider Scott under *Albright*.[3] Amy and T.J. filed a writ of certiorari, which this Court granted. We find the chancellor properly excluded Scott from consideration under *Albright*. Accordingly, we reverse the Court of Appeals' decision and reinstate and affirm the judgment of the chancery court.

## FACTS AND PROCEDURAL HISTORY

¶3.     In 2004, seventeen-year-old Amy began dating twenty-one-year-old Scott. But, during this period, Amy also had a brief relationship with T.J. In July 2004, Amy and Scott were married, and on December 16, 2004, Amy gave birth to Victoria. Initially, Scott believed Victoria was his child.[4] Thereafter, Amy and Scott had a child together, Brackston.

¶4.     In March 2007, T.J.'s mother contacted Amy, informed her that T.J. was about to be deployed with the military, and questioned whether T.J. was Victoria's father. Amy denied that Victoria was T.J.'s daughter, but Scott overheard the conversation. On March 16, 2007, Scott had a DNA test performed which confirmed that he was not Victoria's biological father. Nevertheless, Amy and Scott decided not to disclose Victoria's paternity, and that Scott would continue to raise her as his own child.

¶5.     On December 15, 2009, the chancery court entered an Agreed Judgment of Divorce as to Amy and Scott. The divorce judgment provided, in pertinent part, that "there were two minor children born unto the parties," Victoria and Brackston, and that "[t]he minor children

---

[3]*J.S.W. v. A.W.S. and T.J.S.*, _ So. 3d _, 2013 WL 6231797, at *1 (Miss. Ct. App. Dec. 3, 2013).

[4]As the chancery court noted, Scott "was present when [Victoria] was born, . . . cut [Victoria's] umbilical cord, and . . . even helped to name her."

3

have been in the care, control and custody of" Amy and Scott. The parties were granted joint legal and physical custody of the minor children, with custodial time divided on a week-to-week basis. Both Amy and Scott certified they were Victoria and Brackston's biological parents, although both Amy and Scott knew this to be untrue, as the March 2007 DNA had test confirmed Scott was not Victoria's father.

¶6. Following the divorce, Amy married a man known as "Mr. Ritchie." The marriage lasted a few months, from May 2010 to December 2010. After divorcing Ritchie, Amy began a relationship with Nick Rhods and planned to move to Iowa with both children, where Rhods lived, after marrying him. On January 17, 2011, Amy contacted T.J. regarding the possibility that he was Victoria's father. On January 28, 2011, Amy sued T.J. for support. After a DNA test revealed a 99.999% probability that T.J. was Victoria's biological father, T.J. filed a Motion for Custody, Visitation and Paternity with respect to Victoria, on March 3, 2011. Then, in November of 2011, Amy initiated a Petition for Modification of the 2009 custody agreement made by Scott and herself, so that she could move the children out of state. Scott opposed.

¶7. On March 23, 2012, the chancery court entered its Findings of Fact, Conclusions of Law and Final Judgment. According to the chancery court, Amy, Scott, and T.J. "all seek to have primary physical custody of [Victoria]." The chancery court found, in pertinent part, that:

> [g]iven the testimony presented at trial, [T.J.] had to have known that there was a possibility that he may have been the father of [Victoria], especially when he heard [Amy] was pregnant, and calculated the months in his mind. The [c]ourt also recognizes that [T.J.] did little to nothing to inquire or otherwise try to involve himself in the life of a child that could have been his. However, the

4

[c]ourt does not find that [T.J.'s] conduct met the criteria for abandonment as set out in **Sellers** [**v. Sellers**, 638 So. 2d 481 (Miss. 1994)]. After weighing the rest of the factors set out in **Sellers**, it would seem that [T.J.] has not engaged in conduct that was overly immoral so as to be a detriment to [Victoria], nor does he appear to be one who is unfit to raise a child, especially since he is currently raising his son from a previous relationship.

. . .

Although **In re Leverock**[, 23 So. 3d 424 (Miss. 2009),] differs from the case at hand, in that [T.J.] has not "chosen to take an extended holiday from parenthood," the circumstances are quite similar. Here, [Victoria] has been living with the idea that [Scott] is her biological father her entire life. She has remained in the care and custody of both [Scott] and [Amy] for the past seven years, and has been thriving. According to the holding of **Leverock**, the [c]ourt cannot now arbitrarily remove [Victoria] from the care and custody of [Scott] and [Amy], just based on [T.J.'s] right as a natural parent.

**Leverock** is distinguishable in another important way, and that is that we have both natural parents vying for the custody of [Victoria]. The [c]ourt's analysis does not ignore any and all rights that [Scott] may have to [Victoria] under *in loco parentis*.

. . .

Neither [T.J.] nor [Amy] have done anything to warrant this [c]ourt to deem them unfit to raise their daughter, [Victoria]. [Scott] discovered that [Victoria] was not his biological child in 2007. At that time he had reason to know, or at least should have known, that there was a natural father out there somewhere. However, rather than seek [T.J.] out, [Scott] chose to take no action for the sake of keeping his family together, and continued to support and care for [Victoria]. The [c]ourt finds this to be quite admirable. As such, [Scott] has been effectively acting *in loco parentis* . . . . To phase [Scott] entirely out of [Victoria's] life would be certainly detrimental to her well being. . . . [Scott] is therefore entitled to visitation rights to [Victoria]. The [c]ourt, *however*, must now decide who should be entitled to *physical custody* of [Victoria] as between the child's natural parents, [Amy] and [T.J.].

After conducting an *Albright* analysis as to Victoria's natural parents, the chancery court concluded that it would be in Victoria's "best interest" for Amy to "retain full legal and physical custody . . . , subject to visitation of both [T.J.] and [Scott]."[5]

¶8. Thereafter, Scott filed a Motion to Set Aside Judgment or in the Alternative to Reconsider the Findings of Fact, Conclusions of Law and Final Judgment and for Modification of the Final Judgment. Scott argued that the chancery court failed to consider him, "who was found to be the father *in loco parentis*, in the *Albright* factors[,]" along with Amy and T.J.. The chancery court denied Scott's motion. According to the chancery court, Scott was not entitled to physical-custody consideration in the *Albright* analysis because he failed to prove that Amy and T.J. "were unfit," and the *Albright* analysis for primary physical custody would consider only Amy and T.J.

¶9. Finding that neither Amy nor T.J., as the child's biological parents, was "unfit" to raise Victoria, Scott, who had "effectively act[ed] *in loco parentis*[,]" was entitled only to visitation rights. Following the *Albright* analysis, the chancery court concluded that it would be in Victoria's "best interest" for Amy to "retain full legal and physical custody . . . , subject to visitation of both [T.J.] and [Scott]." Thereafter, the chancery court denied Scott's Motion to Reconsider. Scott then appealed.

¶10. The Mississippi Court of Appeals described this as "a three-way custody action between (1) the natural mother ("Amy"), (2) the mother's ex-husband ("Scott"), who had supported, cared, and treated the child as his own, and (3) the man who turned out to be the

_____

[5] The chancellor did not modify custody with respect to Brackston, which Amy and Scott share.

6

child's biological father ("T.J.")." ***J.S.W.***, 2013 WL 6231797, at *1. The Court of Appeals

reversed the judgment awarding custody to Amy, and remanded "for the chancery court to

conduct an ***Albright*** analysis that takes into consideration whether it would be in the child's

best interest for [Scott] to be awarded custody."[6] *See* ***J.S.W.***, 2013 WL 6231797, at **1, 6.

The Court of Appeals determined that:

> in this "very limited, unique situation," the fact [Scott] stood *in loco parentis*
> by his fatherly actions towards the child *does* rebut the natural parent
> presumption. Thus, the chancellor erred by not considering [Scott] on equal
> footing with [Amy] and [T.J.] when determining which of the three should be
> awarded custody.

*Id*. at *1 (quoting ***Smith***, 97 So. 3d 43, 47 (Miss. 2012)) (emphasis in original). On June 3

and June 10, 2014, the Court of Appeals' denied the motions for rehearing filed by Amy and

T.J.

**ANALYSIS**

I.      **Whether the Court of Appeals' decision is contrary to existing law.**

¶11.    The Court of Appeals held that the chancery court "applied the wrong legal standard."

***J.S.W.***, 2013 WL 6231797, at *3. According to the Court of Appeals:

> [t]he chancellor found that Scott stood *in loco parentis* to Victoria; that he had
> supported, cared, and treated her as his own child, even after he learned about
> her biological parentage; and that he had shared her custody and expenses after
> the divorce. This put Scott in a "very limited, unique situation[,]" where his
> supportive actions towards the child – versus the natural parent's harmful
> actions – rebutted the natural-parent presumption.

---

[6]Maxwell, J., writing. Lee, C.J., Irving and Griffis, P.JJ., Barnes, Ishee, Roberts and
Fair, JJ., concur. James, J., concurs in part and dissents in part without separate written
opinion. Carlton, J., not participating.

*Id.* (quoting *Smith*, 97 So. 3d at 47). Relying upon *Griffith v. Pell*, 881 So. 2d 184 (Miss. 2004), and *J.P.M. v. T.D.M.*, 932 So. 2d 760 (Miss. 2006), the Court of Appeals found that "the doctrine of *in loco parentis* has been used to put the presumed father on equal footing with the natural parent." *J.S.W.*, 2013 WL 6231797, at **4-5. According to the Court of Appeals, "[t]he only difference between this case and *Pell* and *J.P.M.* is that, in those cases, the natural father either disclaimed any rights to the child or could not be conclusively established." *Id.* at *5. By the Court of Appeals' estimation, Scott "overc[a]me the natural-parent presumption," and "should have been considered on equal footing with Amy and T.J. in the chancellor's *Albright* analysis." *Id.* at *6.

¶12.     Amy and T.J. assert that:

> in a custody dispute between one standing *in loco parentis* and a natural parent, the parent is entitled to custody unless the natural parent presumption is rebutted. The court *may not* consider granting custody to a third party, including one standing *in loco parentis*[,] unless and until the third party rebuts this presumption.

According to Amy and T.J., the "three-way *Albright* analysis" contemplated by the Court of Appeals should not be undertaken "until the natural parent presumption is overcome by a finding of unfitness . . . ." They added that "[i]f this law is going to be changed, the change needs to be initiated by" this Court.

¶13.     "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith*, 97 So. 3d at 46. Scott's argument, accepted by the Court of Appeals, is that in his role "as *in loco parentis*[,] [he] did not have to rebut the natural parent presumption. He had just as much right to custody of [Victoria] as did [T.J.] and [Amy]." In other words, as stated by the Court

8

of Appeals, the chancery court "applied the wrong legal standard." ***J.S.W.***, 2013 WL 6231797, at \*3.

¶14.    Recently, in ***Davis v. Vaughn***, 126 So. 3d 33 (Miss. 2013), which involved a custody dispute between a natural father anda  maternal grandmother, this Court affirmed that a third party's *in loco parentis* status, standing alone, could not rebut the natural-parent presumption.[7] According to this Court, "[*i*]*n loco parentis* status carries with it the same duties and liabilities that belong to a natural parent, including a right to custody of the child 'as against *third persons*.'" ***Davis***, 126 So. 3d at 37 (quoting ***Farve v. Medders***, 128 So. 2d 877, 879 (Miss. 1961)) (emphasis in original).  But, in custody disputes involving natural parents, the natural-parent presumption may only "be rebutted by clear and convincing evidence that '(1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.'" ***Davis***, 126 So. 3d at 37 (quoting ***Smith***, 97 So. 3d at 46).  So:

> in a custody dispute between one standing *in loco parentis* and a natural parent, the parent is entitled to custody unless the natural-parent presumption is rebutted.  *The court may not consider granting custody to a third party, including one standing in loco parentis, unless and until the third party rebuts this presumption.*  In other words, "[t]he doctrine of *in loco parentis* does not, by itself, overcome the natural-parent presumption," although it may be a factor in determining whether the presumption has been rebutted.

---

[7]*See **id**. at 34-35 (citing **Smith**, 97 So. 3d at 43).

*Davis*, 126 So. 3d at 37 (quoting *Smith*, 97 So. 3d at 46-47) (internal citations omitted) (emphasis added).[8] This Court added that "[i]f the natural-parent presumption is successfully rebutted, the court may then proceed to determine whether an award of custody to the challenging party will serve the child's best interests." *Davis*, 126 So. 3d at 37 (citing *Smith*, 97 So. 3d at 46).[9]

¶15.    *Smith* involved a custody dispute between a child's grandparents and his natural parents. *Smith*, 97 So. 3d at 44. According to this Court, "a natural parent loses the legal presumption that custody should be with him or her *only* if there has been a clear showing of abandonment, desertion, or unfitness on the part of the parent. The *Albright* factors are not considered unless such showing has first been made." *Id*. (internal citations omitted) (emphasis added). In so holding, this Court emphasized that "[t]he doctrine of *in loco parentis* does not, by itself, overcome the natural-parent presumption." *Id*. at 46-47. And this Court specifically referenced the decisions relied upon by the Court of Appeals in the case *sub judice* (i.e., *Pell* and *J.P.M.*). *See id*. at 47. According to this Court:

> [*i*]*n loco parentis* can – in very limited, unique situations – sometimes be used to *help* rebut the natural-parent presumption. In both *Pell* and *J.P.M.*, a husband learned during the pendency of divorce proceedings that he was not the biological father of a child born of, or just prior to, the marriage. In those cases, we reasoned that the natural-parent presumption had been overcome

---

[8]*See also* **Leverock**, 23 So. 3d at 431; **Sellers**, 638 So. 2d at 485 (quoting **Moody v. Moody**, 211 So. 2d 842, 844 (Miss. 1968)) ("it is the strong policy of the law of this State that a child shall remain in the custody of one of the parents unless there has been a clear showing that both are unfit").

[9]*See also* **Leverock**, 23 So. 3d at 431 ("If the court finds one of these factors has been proven, then the presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the **Albright** factors").

10

based on several facts: (1) the husbands stood *in loco parentis*; (2) they had supported, cared for, and treated the child as their own; (3) they could have been required to pay child support ("with the burden should go the benefit"); and (4) the biological fathers were not really in the picture: the one in *Pell* had disclaimed any interest in the child and had agreed to relinquish his parental rights, while the one in *J.P.M.* could not even be determined conclusively. Though *in loco parentis* was considered in *Pell* and *J.P.M.*, *those cases do not support – nor have we ever suggested – that in loco parentis alone can rebut the natural-parent presumption*.

*Id*. (internal citations omitted) (emphasis added).

¶16.    However, *Smith* also included the following footnote:

[i]n *Pell*, we reversed the chancellor's termination of the husband's parental rights and remanded the case for a best-interest *Albright* analysis; thus, we implicitly found that the natural-parent presumption had been overcome. And in *J.P.M.*, we relied on *Pell* to affirm the chancellor's decision to award physical custody to the husband. *In doing so, we specifically rejected the wife's argument that the chancellor had not had the authority to award custody to the husband without first finding that she had abandoned the child, that her conduct was immoral as to be detrimental to the child, or that she was mentally or otherwise unfit for custody*.[10]

*Smith*, 97 So. 3d at 47 n.3 (internal citations omitted) (emphasis added). And while this Court further noted Presiding Justice Cobb's "well-taken" special concurrence in *J.P.M.*, which critiqued the majority for "us[ing] *in loco parentis* to strip custody from [a natural

---

[10]*J.P.M.* indicated that the "legal father" since the child's birth, who had supported the child under the assumption that he was her natural father and had sustained a "strong father-daughter relationship[,]" was her "father in fact[,]" with "legal rights and obligations" different from those of other third parties (e.g., aunts, grandparents). *J.P.M.*, 932 So. 2d at 768-70. It is unclear whether the rights afforded were truly custody rights, or whether they were mere visitation rights, but it appears the latter was intended, as this Court ultimately affirmed the chancery-court judgment in *J.P.M.* Additionally, the chancellor in the case *sub judice* interpreted *J.P.M.* as providing solely for visitation. *See Griffith*, 881 So. 2d at 186, ("[M]erely because another man was determined to be the minor child's biological father does not automatically negate the father-daughter relationship held by [the *in loco parentis* father] and the minor child.")

11

parent][,]" it added that ***Pell*** and ***J.P.M.*** "are limited to their unique facts[,]" and that "*in loco parentis* was just one of the factors that influenced the Court's decision in those cases." ***Smith***, 97 So. 3d at 47 n.4 (quoting ***J.P.M.***, 932 So. 2d at 781 (Cobb, P.J., specially concurring)).

¶17.    This Court does not find, per the Court of Appeals' conclusion, that the chancery court applied the wrong legal standard. ***J.S.W.***, 2013 WL 6231797, at *3. This Court has stated that the grounds for rebutting the natural-parent presumption involve negative actions/dispositions of the natural parents in relation to the child (i.e., abandonment, desertion, immoral conduct detrimental to the child, unfitness).[11]  And the chancery court's finding, which was not challenged on appeal by Scott or in the Court of Appeals decision, was that Amy and T.J. had not conducted themselves in such a manner as to rebut the natural-parent presumption.  Yet, the Court of Appeals determined that Scott's positive, "supportive[,]" "fatherly actions" operated to rebut the natural-parent presumption and placed him on "equal footing" with Amy and T.J. for purposes of an ***Albright*** analysis. ***J.S.W.***, 2013 WL 6231797, at **1, 3.  This Court does not find that the Court of Appeals' position is congruent with the present state of the law. [12]

----

[11]*See **Davis***, 126 So. 3d at 37 (quoting ***Smith***, 97 So. 3d at 46).

[12]*See **Davis***, 126 So. 3d at 34-35, 37 ("a third party's *in loco parentis* status, standing alone, could not rebut the natural-parent presumption"; at most, *in loco parentis* "may be a factor in determining whether the presumption has been rebutted"); ***Smith***, 97 So. 3d at 47 ("[*i*]*n loco parentis* can – in very limited, unique situations – sometimes be used to help rebut the natural-parent presumption"; ***Pell*** and ***J.P.M.*** "do not support – nor have we ever suggested – that *in loco parentis* alone can rebut the natural-parent presumption").

¶18.    The facts of this case strike this Court as somewhat distinguishable from the "unique facts" in **Pell** and **J.P.M.**  Unlike those cases, in which "the biological fathers were not really in the picture[,]" here, upon confirming that Victoria was his daughter, T.J. instituted custody proceedings.  Also, the fact remains that, as early as March 2007, Scott was aware that he was not Victoria's biological father, yet in the 2009 divorce proceedings, both he and Amy actively purported his paternity to the chancery court.  Moreover, in **Pell**, the *in loco parentis* party had support from the biological father, who sought to wholly relinquish his parental rights and transfer them to the nonbiological father via adoption.

> The parties to the paternity suit entered into an agreed order declaring Griffith the biological father, ordering child support, and stating that all other matters would be decided by the chancellor at a later date. Later, Sonny and Griffith [the *in loco parentis* party and the biological father] filed a motion for declaratory judgment, requesting that Sonny be declared the legal father of the child arguing . . . not only that this declaration would be in the best interest of the child but that Sue Ann should be estopped from denying Sonny's paternity as well. Griffith agreed to relinquish all parental rights and allow Sonny to adopt the child. The chancellor denied their motion for declaratory judgment, set child support payments, and granted Griffith reasonable visitation.

**Pell**, 881 So. 2d at 185.  Unlike the biological father in **Pell**, in this action, the biological father not only sought custody, but did so *to the exclusion* of the *in loco parentis* party.[13]  For reasons unknown, the chancellor in **Pell** denied the natural and *in loco parentis* fathers' requests for what was, essentially, an intended adoption.  And it appears from **Smith** that this Court found the presumption rebutted by the exception created in **Pell**, based upon what the biological father wanted.

---

[13] T.J. testified, "[Scott] can have visitation . . . [w]hen he goes and picks up [Brackston], his son, he can visit with my daughter . . . because I'm the father."

13

¶19. Under the present state of the law, in the absence of rebutting the natural-parent presumption via clear and convincing evidence of abandonment, desertion, immoral conduct detrimental to the child, and/or unfitness, "[t]he court may not consider granting custody to a third party, including one standing *in loco parentis* . . . ." **Davis**, 126 So. 3d at 37 (quoting **Smith**, 97 So. 3d at 46-47).

¶20. We find the chancellor's determination in this case to be correct, given the controlling law discussed above.

## CONCLUSION

¶21. We find the chancellor applied the correct legal standard, and, on this basis, we reverse the Court of Appeals' decision. Absent a finding that the natural parents had abandoned, deserted, or were unfit to rear their child, the chancellor properly conducted the requisite analysis for custody and thereby properly excluded the *in loco parentis* party from consideration. Accordingly, we reverse the Court of Appeals' decision and reinstate and affirm the judgment of the Lamar County Chancery Court.

¶22. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, KING AND COLEMAN, JJ., CONCUR.**