# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CA-01550-SCT

*HALEY SUMMERS*

*v.*

*PATRICK GROS AND SHERRY GROS*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/02/2019 |
| TRIAL JUDGE: | HON. CARTER O. BISE |
| TRIAL COURT ATTORNEYS: | JASON MICHAEL JOSEF |
| | SAMUEL CHRISTOPHER JOHNSON |
| | MICHAEL DEWAYNE WILSON, SR. |
| | HAROLD O. GRISSOM, JR. |
| | DIANNE HERMAN ELLIS |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DIANNE HERMAN ELLIS |
| ATTORNEY FOR APPELLEES: | HAROLD O. GRISSOM, JR. |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 06/03/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. This is a custody dispute between the mother of an eleven-year-old boy and the boy's paternal grandparents. "John"[1] had been living in his grandparents' home for about six years at the time of the judgment, and the chancery court ultimately found that John's mother had

---

[1] We use a fictitious name since a guardian ad litem was appointed to investigate potential sexual abuse of the child.

deserted him and that it was in John's best interest that his grandparents be awarded custody. We cannot find that to be an abuse of discretion, so we affirm the chancery court's judgment.

**FACTS**

¶2.     John was born in July 2009 to Michael Gros and Haley Summers, an unmarried couple.  By 2013, the romantic relationship between Haley and Michael had ended, but they were still living together with the child.  In June 2013, Haley married Jesse Summers, who was then incarcerated in Texas for burglary, theft, and drug possession.  Haley and Jesse had dated in high school and had rekindled their relationship while he was incarcerated.  Michael and John then moved into John's paternal grandparents' home.  Michael often traveled for work, and John would stay with Haley on weekends and holidays.

¶3.     The arrangement broke down when Haley took the child to the Houston, Texas area for Easter in April 2014.  Before releasing John to Haley, John's paternal grandparents had required Haley to sign an agreement to return John to their custody after she returned.  But when Haley came back to Mississippi, she did not return John to the Groses' household.  This prompted Michael to file a suit for custody.  Haley was pro se at the first hearing.  In May 2014, the chancellor entered a temporary order granting custody to the paternal grandparents, who were not at that time parties.  The order did not include any express provision for visitation or child support from the natural parents.

¶4.     The same day as the temporary-custody hearing, Haley secured an attorney and began contesting Michael's petition for custody.   But Haley did not file a petition for visitation until September 10, 2014, and she did not see John between May 20, 2014, and October 20,

2

2014. In late October 2014, the chancellor ordered that Haley be given limited weekend visitation for two hours the next Saturday, then four hours on each subsequent Saturday.

¶5. Haley began exercising visitation with John after the temporary order giving her weekend visitation, but in early January 2015, Haley's husband was released from prison, and she moved to Texas to live with him. On April 28, 2016, Haley gave birth to a daughter. She did not exercise visitation with John between January 2015 and June 2016. After June 2016, Haley began visiting once or twice per month.

¶6. In February 2016, the paternal grandparents (Cornell and Sherry Gros) moved to be joined as parties. In March 2016, the natural parents were ordered to pay 14 percent of their income as child support, though specific amounts were not set. The chancellor also entered an order permitting the grandparents to "alter or stop visitation" "regardless of the order" if "they feel [it] is in the best interest of the minor child," with the qualification that the paternal grandparents were to "immediately come before the Court to resolve any issues they have." On March 15, 2016 (about a week later), the paternal grandparents petitioned for custody.

¶7. On August 18, 2016, Michael was arrested for sexually abusing a child, his stepdaughter. Haley then petitioned for emergency custody of John, but the Court left temporary custody with the grandparents; Michael was prohibited from having contact with the child. Michael was ultimately convicted and sentenced to fifteen years' incarceration.

¶8. On February 28, 2017, Haley's husband was found dead in the garage of their home in Texas. On March 23, 2017, Haley petitioned to modify the temporary-custody order, arguing that the chancery court had denied her custody because her late husband had been

3

a convicted felon. The grandparents simultaneously filed a motion to suspend visitation because of "uncertainty regarding the circumstances of [Haley's husband's] death." On January 13, 2018, Haley again moved to modify the temporary-custody order; she also asked the chancellor to recuse because her attorney was running against him in an upcoming election. The recusal motion was granted.

¶9. On May 23, 2018, and with the new chancellor appointed, the chancery court held a hearing on the competing motions. After hearing the grandparents' case-in-chief, the chancellor granted Haley's Mississippi Rule of Civil Procedure 41(b) motion dismissing the grandparents' claim for custody.

¶10. The grandparents moved for reconsideration, pointing out that the chancellor had relied on the guardian ad litem's report but that the guardian ad litem had not testified and had not been subject to cross-examination. On June 29, 2018, the chancery court granted the motion for reconsideration and ordered another hearing. The trial continued on October 23, 2018, after which it was concluded. The chancery court observed that the guardian ad litem had been unaware of certain key facts as revealed on cross-examination. The court ultimately found that Haley had deserted her son because of a prolonged failure to exercise visitation and pay child support during the pendency of the litigation. The court ordered another hearing to determine the child's best interest as to custody; that hearing was held September 12, 2019. The chancery court conducted an *Albright*[2] analysis and concluded that

---

[2] *See **Albright v. Albright**, 437 So. 2d 1003 (Miss. 1983).*

4

John's best interest required that custody be awarded to his paternal grandparents. Haley appealed from that judgment.

## STANDARD OF REVIEW

¶11.   "This Court uses a limited standard of review when examining domestic-relations cases." *Ray v. Ray*, 304 So. 3d 598, 599 (Miss. 2020)  (citing *Gerty v. Gerty*, 265 So. 3d 121, 130 (Miss. 2018)).  We will not overturn a chancellor's findings of fact unless they are "manifestly wrong or clearly erroneous." *McNeese v. McNeese*, 119 So. 3d 264, 272 (Miss. 2013) (internal quotation marks omitted) (quoting *Duncan v. Duncan*, 774 So. 2d 418, 419 (Miss. 2000)).  Legal conclusions, however, are reviewed de novo. *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 155 (Miss. 2011).

## DISCUSSION

### 1.   Temporary-Custody and Visitation Orders

¶12.   In her first two issues on appeal, Haley complains that the chancery court erroneously awarded temporary custody of John to his paternal grandparents and that the chancery court erred by limiting her visitation to four hours, once per week, for the first four years of this litigation.  Haley contends that the record lacks evidentiary support for these temporary orders and that she should have enjoyed the benefit of the natural-parent presumption for temporary custody and should have received a more standard visitation arrangement.  The litigation ended up dragging on for many years, and the chancellor's decision to place the child in the temporary custody of the grandparents undoubtedly had a practical, even decisive impact on the ultimate disposition: at the time of the final judgment, John had been living in

5

the grandparents' home for about six years, most of his life. The initial visitation arrangement—four hours once per week—was undoubtedly onerous after Haley moved to Texas and contributed to her failure to visit with the child for an extended period of time.

¶13. We do have reservations about the correctness of the temporary orders, but we also observe also that it is apparent Haley failed to diligently litigate the case. For example, Haley contends that there was no written visitation order entered until seventeen months after the May 22, 2014 temporary-custody order. During this time, Haley contends the grandparents denied her meaningful visitation. But it took Haley more than three months to file a petition for visitation after the initial temporary-custody order. The petition was promptly heard, and the chancellor orally ordered visitation in October 2014; but Haley took a year to prepare the written order as directed. During this time, she contends the grandparents denied her visitation, but she did not file a petition for contempt until December 2015; and she never brought that petition to a hearing. In fact, the record reflects that Haley exercised visitation under the oral visitation order a few times before moving to Texas in January 2015. She ceased visitation entirely until June 2016 and then only visited about once per month after that until April 2018.

¶14. After reviewing the record, we conclude that Haley has failed to demonstrate that an error in the temporary-custody award or visitation arrangements would entitle her to relief, since those temporary orders are no longer in effect. As the Court of Appeals has recently observed, "A temporary custody order is just that, temporary . . . ." **Sanders v. Sanders**, 281 So. 3d 1043, 1054 (Miss. Ct. App. 2019) (internal quotation marks omitted) (quoting **Neely**

6

***v. Welch***, 194 So. 3d 149, 160 (Miss. Ct. App. 2015)). The temporary orders have been superseded by the custody decree and are moot.

**2.      Guardian ad Litem**

¶15.    The chancellor found that the appointment of a guardian ad litem was mandatory because of the mother's allegations concerning the father, Michael Gros, who had been indicted in August 2016 for sexually abusing a different child, his stepdaughter. By the time this case came to trial, Michael was serving a lengthy prison sentence. No evidence was presented that Michael had abused John, nor was there any specific allegation that he had; but there was concern about what might have happened and what John might have been exposed to in his paternal grandparents' home. The guardian ad litem subsequently reported no evidence that John had been molested, but she also noted that he was never subjected to a forensic interview.

¶16.    Ultimately, the guardian ad litem did not make a custody recommendation per se; but her report expressly stated that she had found no basis to overcome the natural-parent presumption. She had "not found any negative factors that weigh against the mother's natural parent presumption." The consequence of this would be that Haley, the mother, would get custody. "The law recognizes that parents are the natural guardians of their children, and 'it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party.'" ***Garner v. Garner***, 283 So. 3d 120, 129 (Miss. 2019) (internal quotation marks omitted) (quoting ***Davis v. Vaughn***, 126 So. 3d 33, 37 (Miss. 2013)).

7

¶17. The chancellor initially accepted the guardian ad litem's conclusions regarding the natural-parent presumption, but after the guardian ad litem appeared and testified on rehearing, the chancellor changed his mind. He ultimately found from the bench: "With regard to the guardian ad litem's report, I will let that be admitted. She identified it as her report. That does not mean that I am accepting it. I find that on cross-examination she did not make a thorough and sufficient investigation as guardian ad litem."

¶18. On appeal, Haley contends that the guardian ad litem appointment was mandatory and that the chancellor failed to address the guardian ad litem's recommendation as required by caselaw. This Court has held:

> In child-custody cases where there are allegations of abuse or neglect, courts must appoint a guardian. Miss. Code Ann. § 93-5-23 (Rev. 2013); *Floyd v. Floyd*, 949 So. 2d 26, 28 (Miss. 2007). And when the appointment is mandatory, chancellors, in their findings of fact, must include at least a summary of the guardian ad litem's recommendations. *Id.* While a chancellor is not bound by the guardian ad litem's recommendations, "if the court rejects the recommendations . . . , the court's findings must include its reasons for rejecting the guardian's recommendations." *Id.*; *S.N.C. v. J.R.D., Jr.*, 755 So. 2d 1077, 1082 (Miss. 2000).

*Borden v. Borden*, 167 So. 3d 238, 243 (Miss. 2014) (alteration in original).

¶19. We observe also that this Court has recently held, in *Barber v. Barber*, 288 So. 3d 325, 333-35 (Miss. 2020), that once a chancellor has found a guardian ad litem's appointment to be mandatory, the chancellor is required to hear the guardian ad litem's report and to explain his reasons for not following its recommendations. This is true regardless of whether the allegations of abuse turn out to be substantiated. *Id.*

8

¶20. That being said, the chancellor did all of the things required of him by **Borden** and **Barber**, just not all at the same time. To the extent that the guardian ad litem made a custody recommendation, it was just that she had "not found any negative factors that weigh against the mother's natural parent presumption." The chancellor acknowledged this finding on the record from the bench; he even initially accepted it as correct. The chancellor subsequently changed his mind after the guardian ad litem testified and was cross-examined. And the chancellor explained his reasons—the guardian ad litem had not been aware of certain key facts relating to Haley's lengthy failures to exercise meaningful visitation or provide monetary support for the child. The record leaves no doubt that the chancellor was aware of the guardian ad litem's recommendations and the reasons for them and still reached a different conclusion. We find that to be sufficient.

¶21. Haley also contends that the chancellor erred when he "revised the designation of the Guardian ad Litem as an expert witness." The original order appointing a guardian ad litem had required that the guardian ad litem testify as an "expert," but the chancellor subsequently removed that requirement. Haley does not explain or brief this complaint beyond the bare assertion in the brief that it was error. This Court requires "that counsel not only make a condensed statement of the case but also support proposition with reasons and authorities in each case." **Holland v. State**, 705 So. 2d 307, 337 (Miss. 1997) (internal quotation mark omitted) (quoting **Roberson v. State**, 595 So. 2d 1310, 1318 (Miss. 1992)). "The law is well established that points not argued in the brief on appeal are abandoned and waived." **Arrington v. State**, 267 So. 3d 753, 756 (Miss. 2019) (citing **Collins v. City of Newton**, 240

9

So.3d 1211, 1221 (Miss. 2018)). "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Id.* (internal quotation marks omitted) (quoting *Byrom v. State*, 863 So. 2d 836, 853 (Miss. 2003)).

¶22. Moreover, the chancellor's order appointing a guardian ad litem "should not permanently bind the court should needs change as the litigation progresses." *S.G. v. D.C.*, 13 So. 3d 269, 281 (Miss. 2009). The chancellor may expand or limit the role of a guardian ad litem "as the needs of a particular case dictate . . . ." *Id.* at 281. "The guardian ad litem may serve in a very limited purpose if the court finds such service necessary in the interest of justice[,]" and his or her "role at trial may vary depending on the needs of the particular case." *Id.* at 280-81.

¶23. Additionally, Haley was the proponent of the guardian ad litem's testimony. Requiring the guardian ad litem to qualify as an expert before making a recommendation could only have impeded her from testifying. It appears that what Haley really wants was for the court to hold that the guardian ad litem *could* be qualified as an expert. Haley did offer the guardian ad litem as an expert at trial, and she was rebuffed after Haley was unable to explain what kind of an expert the guardian ad litem was supposed to be; the chancellor held that he would allow the guardian ad litem "to testify as a guardian ad litem." Haley does not point to any proffered testimony that was excluded as a result of this ruling or any other prejudice as a result of the chancellor's decision—indeed, Haley entirely fails to brief this argument. We conclude that no error has been shown on this point.

### 4. Natural-Parent Presumption

10

¶24. In her final issue, Haley contends that the chancellor erred by finding that the natural-parent custody presumption had been overcome; Haley does not argue that the chancellor erred by finding that it was in John's best interest to remain in the Groses' household.

¶25. The chancellor found that the natural-parent presumption had been overcome because, after Haley moved to Texas, she totally failed to exercise visitation with the child for extended periods of time, with only a few visits in between. Haley also failed to support the child financially and failed to take an active role in the child's education and civic activities. The chancellor explained in detail:

> Previously, as of the October, 2018, hearing and the prior hearings, the testimony and exhibits showed that between August 8, 2013 and April 17, 2014, Haley only visited with [John] 53 days while she was still living here in South Mississippi. On April 18, 2014, Haley took [John] and did not return [John] to Mississippi until the court order of May 19, 2014. From May 19, 2014, until October 20, 2014, she did not visit [John]. She did not contact him. On September 10, 2014, she did request visitation and got it. And between October 21, 2014 and December 31, 2014 she was given nine days of visitation, and she missed only one of those days. However, between January 1, 2015, and November 31, 2015, she had 42 days available of visitation, and she missed all 42. From December 1, 2015 until April 31, 2018, she had 125 days of visitation available, and of those, she missed 106.
>
> With regard to support, prior to March 8, 2016, there was no support paid. After the court order was entered through April, 2017, Haley was ordered to pay child support and only shortly before we went to trial in October 2018, did she pay her back child support that was due. Between November 18, 2018—and that was the day of trial. On November the 18, 2018 through January of 2019, she paid zero child support. On February 19, 2019, she paid a lump sum that brought her current for the February, 2019, hearing. From March of 2019 until August of 2019, she paid no child support. She did catch up her child support right before trial again this month.
>
> Haley has paid nothing toward noncovered medicals incurred by the Groses. She has paid nothing for which she has evidence toward school, clothing, or other supplies for [John]. She was placed by the Groses on the email list for

Holy Trinity School, and she asked to be taken off of that school email list. She has not been to the school even though she knows where it is. She has not pursued the right to be put on that email list again. She has not pursued the right to at least visit the school with [John]. She has not gone to his church, although she knows what church it is. She has taken no effort to attend his scouting events, even though she knows when and where they meet, instead placing the responsibility on the Groses for not having invited her. The court again finds that Haley has voluntarily abandoned her parental responsibilities and removed herself from active participation in [John]'s life by leaving [John] with the Groses, by leaving his sole support to the Groses, and by refusing to avail herself of reasonable visitation as granted.

The natural parent presumption has been overcome and rebutted by clear and convincing evidence.

¶26. "The law recognizes that parents are the natural guardians of their children, and 'it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party.'" *Garner*, 283 So. 3d at 129 (internal quotation marks omitted) (quoting *Davis*, 126 So. 3d at 37). The natural-parent presumption, codified in the Mississippi Code Section 93-5-24(1)(e) (Rev. 2018), requires a finding that "the parents of the child have abandoned or deserted such child or that both such parents are mentally, morally or otherwise unfit to rear and train the child" before custody can be awarded to a third party. "[G]randparents who stand *in loco parentis* have no right to the custody of a grandchild, as against a natural parent, unless the natural-parent presumption is first overcome by a showing of abandonment, desertion, detrimental immorality, or unfitness on the part of the natural parent." *Wells v. Smith (In re Adoption of Wells)*, 97 So. 3d 43, 47-48 (Miss. 2012). "[T]he natural-parent presumption may be rebutted by clear and convincing evidence that: '(1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct

is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.'" *Garner*, 283 So. 3d at 129 (quoting *Davis*, 126 So. 3d at 37).

¶27. In her brief on appeal, Haley presents several arguments. First, she contends that the chancellor erred by considering a definition of desertion recently codified in Mississippi Code Section 93-15-103(d)(i) (Rev. 2018): "Any conduct by the parent over an extended period of time that demonstrates a willful neglect or refusal to provide for the support and maintenance of the child[.]" Haley correctly points out that this statute is addressed to the termination of parental rights rather than third-party custody. But she presents no cases in which this Court has distinguished between the definition of desertion in the custody context versus termination-of-parental-rights or adoption contexts. And it stands to reason that if there was a difference, the definition for termination of parental rights would be more stringent than for third-party custody since third-party custody is a much less severe curtailment of parental rights than terminating parental rights entirely.

¶28. Indeed, we observe that the definition of desertion favored by Haley actually derives from adoption/termination-of-parental rights cases. This Court defined desertion in *Davis v. Vaughn*, 126 So. 3d 33, 39 (Miss. 2013), as "foresaking one's duty as well as a breaking away from or breaking off associations with some matter involving a legal or moral obligation or some object of loyalty." (internal quotation marks omitted). But *Davis* was quoting *Petit v. Holifield*, 443 So. 2d 874, 878 (Miss. 1984), which was itself citing *Ainsworth v. Natural Father (In re Adoption of Minor Child)*, 414 So. 2d 417 (Miss. 1982), both adoption/termination-of-parental-rights cases.

13

¶29. Moreover, Haley fails to show that the chancellor actually employed the new statutory definition; it was argued by the grandparents' counsel, but the chancellor did not mention it in his written opinion; instead, he cited both Haley's failure to support the child and her failure to exercise meaningful visitation over an extended period of time.

¶30. The new statutory definition of desertion may very well conflict with this Court's prior decisions holding that failure to pay child support, alone, does not constitute desertion. *See, e.g.*, *In re Interest of J.D.*, 512 So. 2d 684, 686 (Miss. 1987) ("'[C]onstant arrearages in child support payments' do not constitute abandonment or desertion." (quoting *Miller v. Arrington (In re Adoption of a Female Child)*, 412 So.2d 1175, 1178 (Miss. 1982))). But we are not required to decide that question today because this case involved much more than failure to pay child support.

¶31. Haley next argues that the judge erred by not finding that desertion had been rebutted. Mississippi Code Section 93-15-119(2) (Rev. 2018) states:

> (2) An allegation of desertion may be fully rebutted by proof that the parent, in accordance with the parent's means and knowledge of the mother's pregnancy or the child's birth, either:
>
>> (a) Provided financial support, including, but not limited to, the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of the pregnancy and birth, and contributions of consistent support of the child after birth; frequently and consistently visited the child after birth; and is now willing and able to assume legal and physical care of the child; or
>>
>> (b) Was willing to provide financial support and to make visitations with the child, but reasonable attempts to do so were thwarted by the mother or her agents, and that the parent is now willing and able to assume legal and physical care of the child.

14

¶32.    We observe that section 93-15-119(2) is a defense to termination of parental rights as opposed to third-party custody. But even if we were to hold that it applied to third-party custody, Haley fails to show that she actually could rebut a finding of desertion under Section 93-15-119(2). As the chancellor found, Haley did not make "contributions of consistent support of the child after birth," and she failed to "frequently and consistently visit[] the child" for years on end.

¶33.    Finally, Haley contends that there was insufficient evidence of desertion under the definition used in *Davis*: "Desertion is defined as 'foresaking one's duty as well as a breaking away from or breaking off associations with some matter involving a legal or moral obligation or some object of loyalty.'" *Davis*, 126 So. 3d at 39 (quoting *Petit*, 443 So. 2d at 878). Haley also cites *Petit*, a case in which the father had visited a child five times in eighteen months after divorce and had not paid child support, apparently because he did not have the means while maintaining his then-existing lifestyle. *Petit*, 443 So. 2d at 878. This Court reversed the chancellor's finding of desertion because the chancellor had not held the father in contempt for the failure to support the child. *Id.* The failure to pay support was insufficient to constitute abandonment or desertion, but the father was "'teetering' on the brink[,]" *id.* at 878, and the question was "extremely close." *Id.* at 879. The Court went so far as to declare that "if the totality of the circumstances continue without improvement over a substantial period of time in the future, a court would be justified in decreeing an adoption over his protest." *Id.* at 878. Haley's failures to exercise meaningful visitation or support the child extended over a much longer period of time than in *Petit*.

15

¶34. The record reflects that Haley voluntarily allowed John to move into the Groses' household in 2013, when he was four years old. After Haley broke up with John's father, the child remained in the Gros household, and Haley moved to Texas. Haley did not exercise visitation with the child for extended periods of time, more than a year at one point. Haley did not help support the child before support was ordered and only then did so in fits and starts. While we sympathize with Haley's complaints that she was mistreated by the temporary orders, Haley failed to vigorously litigate the case or avail herself of the remedies available to her. The practical impact on John was undeniable; Haley barely visited with him for several years.

¶35. Haley's claims that the grandparents frustrated her visitation are likewise without merit; while they admitted to sometimes refusing her visitation, for various reasons, Haley never showed them to have been in contempt of the chancery court's visitation orders. As to who was right or wrong, the chancellor found the grandparents credible and Haley not credible.

¶36. We concede that the record here could have supported a finding that Haley did not abandon John. This Court affirmed a finding of no desertion in *Davis*, 126 So. 3d at 39, despite the father's visiting the child only sporadically and providing little financial support for more than three years. There is no bright-line rule defining desertion. *See Patrick v. Boyd*, 198 So. 3d 436, 443 (Miss. Ct. App. 2016). Instead, desertion is "a factual question best left to the trial judge[.]" *Davis*, 126 So. 3d at 40.

16

¶37. The chancellor found that Haley's lack of meaningful visitation and support over such an extended period constituted desertion. Ultimately, Haley fails to show manifest error or an abuse of discretion in the chancellor's findings. We are required to affirm the chancellor's decision.

¶38. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶39. Because I would find that the chancery court abused its discretion by finding that Haley Summers had deserted her son and that Cornell and Sherry Gros (collectively, "the Groses") had overcome the natural-parent presumption, I respectfully dissent.

¶40. In a case of child custody, parents are awarded "a natural-parent presumption favoring an award of custody." *Ballard v. Ballard*, 255 So. 3d 126, 132 (Miss. 2017) (citing *Waites v. Ritchie (In re Waites)*, 152 So. 3d 306, 311 (Miss. 2014)). As the United States Supreme Court has stated, "[t]he interest of parents in the care, custody, and control of their children— is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* (internal quotation marks omitted) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944)).

17

¶41.	A clear showing of desertion, however, may rebut the natural-parent presumption. ***Ballard***, 255 So. 3d at 132 (citing ***In re Waites***, 152 So. 3d at 311). To determine custody of a child, Mississippi Code Section 93-5-24(1)(e) states that

> (1) Custody shall be awarded as follows according to the best interests of the child:
>
> . . . .
>
> (e) Upon a finding by the court that both of the parents of the child have abandoned or deserted such child or that both such parents are mentally, morally or otherwise unfit to rear and train the child the court may award physical and legal custody to:
>
> (i) The person in whose home the child has been living in a wholesome and stable environment . . . .

Miss. Code Ann. § 93-5-24(1)(e)(i) (Rev. 2018). The chancery court found that, because Haley had the means to support her son John but chose not to, she had deserted him.[3] Accordingly, the chancery court found that the Groses, John's paternal grandparents, had overcome the natural-parent presumption.

¶42.	The majority concedes that the record "could have supported" a finding that Haley did not desert John. Maj. Op. ¶ 36. Because the natural-parent presumption is a fundamental liberty interest, I would find that if the record could support a finding that Haley did not desert John, the chancellor manifestly erred by finding desertion.

¶43.	Haley and Michael Gros, John's father, raised John together until 2013. Haley testified that when she and Michael separated in 2013, John stayed with her. The majority states that "[t]he record reflects that Haley voluntarily allowed John to move into the Groses' household

---

[3]John is a fictitious name.

in 2013, when he was four years old." Maj. Op. ¶ 43. Yet Haley testified that John had resided with her until Michael and the Groses proposed an opportunity for John to attend Holy Trinity Catholic School, a "really good school" in Bay St. Louis where the Groses lived. The Groses offered to pay for the private-school tuition. Haley repeatedly testified that education was important to her and that she had agreed to let John stay with the Groses in order to attend a better school. Haley testified that she would see John on weekends and every holiday during that time. She then testified that she became uncomfortable with the arrangement because she was unable to spend enough time with John.

¶44. In 2014, Easter weekend, Haley testified that she wanted to take John to Texas but that the Groses had required her to sign a piece of paper stating that she would return John to their custody. She stated that it was "absolutely absurd and never how [the] situation was supposed to be." Therefore, when she returned to Mississippi, she did not return John to the Groses' care. Michael filed for custody of John shortly afterward.

¶45. In finding that Haley had deserted John, the trial court stated that "between August 8, 2013 and April 17, 2014, Haley only visited with John 53 days while she was still living here in South Mississippi." However, as previously stated, John was living with Michael and the Groses at that time to further his education. Thirty-six weeks occurred between August 8, 2013, and April 17, 2014. So Haley had visited with John the equivalent of more than every weekend during that time. Haley's testimony during the May 22, 2014 hearing supported that she saw John on weekends and holidays while he was staying with the Groses to attend school.

¶46. The trial court noted that Haley did not visit John between May 19, 2014, until October 20, 2014. However, an order was entered on May 22, 2014, that granted temporary custody of John to the Groses, who were not parties to the action. No provision was made for visitation in the May 22 order. During the hearing on October 21, 2014, Haley's attorney asserted that the Groses had not allowed Haley to contact John since they had been granted temporary custody. In addition, at that hearing, Michael's attorney stated that Michael and Haley had agreed that John would be returned to live with Haley. Yet the Groses, who still were not parties to the action, did not agree to that arrangement.

¶47. Haley was first granted visitation with John for two hours on October 25, 2014, two hours on November 1, 2014, and then four hours every Saturday thereafter. As the trial court stated, "between October 21, 2014 and December 31, 2014 she was given nine days of visitation, and she missed only one of those days."

¶48. Haley moved to Texas in January 2015. Between January 1, 2015, and November 31, 2015, Haley had forty-two days available of visitation. She did not visit John during that time. But the record shows that on December 7, 2015, Haley filed a Motion to Find Plaintiffs in Contempt of Court in which she alleged that the Groses had "wholly and repeatedly refused to allow Haley Summers to exercise her right to visitation" and alleged that the Groses had "repeatedly interfered with Haley['s] . . . relationship with the minor child by intentionally, deliberately and willfully refusing to accept and/or respond to [Haley's] repeated phone calls, text messages and phone calls to arrange visitation with the minor

20

child." The Groses responded and stated that they had received no notice of the temporary-visitation order and were not aware of it.

¶49. The trial judge stated, from December 1, 2015, until April 31, 2018, Haley had 125 days of visitation available and missed 106 days. It is true that 125 weekends occurred between those dates. Still, at the April 11, 2017 hearing, testimony showed that the Groses had not allowed Haley to see John since February.[4] Therefore, the trial judge's assertion that Haley had 125 days of visitation available was inaccurate. At that hearing, the trial judge ordered visitation to continue and also ordered telephonic visitation. Haley testified, and Sherry Gros confirmed, that she talked to John on the phone almost every day, most of that time through FaceTime.

¶50. Moreover, Haley's husband died on February 26, 2016. Her daughter was born on April 28, 2016. Thus, with her spouse recently deceased and with a newborn daughter, I would not fault her for being unable to visit John in Mississippi, approximately nine hours away, for some time, especially considering the limited, one-day-a-week-for-four-hours visitation schedule she had been granted.

¶51. It is true that Haley failed to pay child support for eighteen months. She testified that she chose to spend the limited funds available to her to buy John "a bike, an Xbox, sporting equipment, food, a number of trips to educational places, and a counselor." Haley also spent

---

[4]Counsel for the Groses confirmed this assertion and stated that the Groses had felt uncomfortable after Haley's husband had died because they were unsure if drugs or gang activity had been involved in his death. A text message in the record purportedly from Cornell Gros stated, "[w]e are uncomfortable with visitation at this time due to some uncertainty and our attorney will be contacting your attorney. Thank you[.]"

a large amount of her funds on traveling from Texas to Mississippi to visit John. She testified: "I do things with [John] when we're here. We don't just sit around. So we go and do anything really that he wants to do. We eat wherever he wants to eat and try to do as many fun activities as I possibly can with him." So, while Haley clearly was in the wrong for failing to pay child support, she did spend money on John for food and clothing. Haley acknowledged that, for a time, she chose "in hindsight probably wrongfully" to maintain the relationship with John by visiting him and spending money on their outings rather than paying child support. And lastly, although Haley never offered to contribute to John's educational, medical, or dental expenses, the Groses also did not send Haley any bills related to those matters. Sherry Gros testified that she had not even notified Haley when she took John to doctor or dental visits.

¶52. Desertion means "[t]o forsake (a person, institution, cause, etc., having a moral or legal claims upon one) . . . [or] [t]o forsake one's duty, one's post or one's party." ***Wells v. Smith (In re Adoption of Wells)***, 97 So. 3d 43, 48 (Miss. 2012) (alterations in original) (internal quotation marks omitted) (quoting ***Pendleton v. Leverock (In re Dissolution of Marriage of Leverock)***, 23 So. 3d 424, 430 n.2 (Miss. 2009)). In ***Smith***, the mother of the child at issue was found to have deserted her child because the child had been in the mother's "'exclusive care and custody for a period totaling no more than twelve weeks since he had been born[,]' . . . and she [had] not offered any financial support, or made any reasonable efforts to be with the child prior to the initiations of [the] proceedings[.]'" ***Id.*** at 48 (first, third, fourth, and fifth alterations in original).

22

¶53. Conversely, this Court affirmed the chancellor's ruling that a father had not deserted his child even though the child had lived with her grandmother for two years and the father's interaction with the child was "sporadic, and he contributed little financial assistance." *Davis v. Vaughn*, 126 So. 3d 33, 35 (Miss. 2013). After the two-year period, the father had agreed to let the child live in the grandmother's care for three more years. *Id.* at 35. Even still, the father's "agreement to the temporary custody order did not constitute relinquishment of his parental rights." *Id.* at 36 (citing *Vaughn v. Davis*, 36 So. 3d 1261 (Miss. 2010)).

¶54. To support its finding of desertion, the trial court cited *Hartley v. Watts*, 255 So. 3d 114, 122 (Miss. 2017), a termination-of-parental-rights case in which this Court found that the father of the children at issue had "consistently shirked any responsibility for providing support and never offered to provide support to his children." There, the father in the action had been convicted of a sex offense, had been in prison for two years during the lives of his children, and had not supported his children for more than two years after he was released from prison. *Id.* at 117. The father "had intermittent contact with his children through phone calls and Skype. [He] also spent a total of twenty-seven days and nine hours with his children through visits spanning from June 21, 2011, through March 15, 2014." *Id.* The chancellor stated that "[i]t is virtually incomprehensible to believe a father-child relationship, after the extended absence since [A.B.] was an infant and complete absence in the case of [B.H.], could be re-established with twenty-seven days and [nine] hours of physical contact coupled with Skype and phone contact." *Id.* at 124 (internal quotation marks omitted).

¶55. The instant case presents a vastly different picture. Unlike the father in *Hartley*, a mother-child relationship was ongoing from the time John was born. Haley raised John until he was four years old. She was approached with an opportunity for John to attend a good school and only then did she agree to allow him to stay with the Groses. Haley testified that she visited John almost every weekend until she became uncomfortable with how little time she was able to spend with him. When Haley refused to return John, Michael filed for custody. When Haley was able to have telephonic visitation, she called John every night. She did sporadically pay child support but would spend money on John during her limited visitation hours.

¶56. Because the natural-parent presumption is a fundamental liberty interest and because the record could have supported a finding that Haley did not desert John, I respectfully dissent and would find that the Groses failed to overcome the natural-parent presumption in this case.

**GRIFFIS, J., JOINS THIS OPINION.**