# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CP-00926-COA

**HATTIE T.**                                                        **APPELLANT**

**v.**

**MATTHEW R. AND MELISSA R.**                                        **APPELLEES**

DATE OF JUDGMENT:           08/19/2022
TRIAL JUDGE:                HON. BILLIE J. GRAHAM
COURT FROM WHICH APPEALED:  JONES COUNTY CHANCERY COURT,
                            SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:     HATTIE T. (PRO SE)
ATTORNEY FOR APPELLEES:     BARRON CRUZ GRAY
NATURE OF THE CASE:         CIVIL - CUSTODY
DISPOSITION:                AFFIRMED - 06/04/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., GREENLEE AND WESTBROOKS, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.    Hattie T. (Hattie) appeals from the Jones County Chancery Court's final judgment terminating her parental rights. On appeal, she claims that the chancery court lacked jurisdiction and that the chancellor's decision to terminate her parental rights was not supported by the evidence. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

### I.    Jasper County Youth Court Proceedings

¶2.    In February 2019, the Jasper County Youth Court removed JT and RJ[1] from the

_____

[1] We use initials to protect the minor children's identities who were born in 2015 and 2017, respectively. We also use first names of the biological and foster parents to further protect the minor children's identities.

custody of their biological mother (Hattie) upon allegations of abuse and neglect. In March 2019, as part of its adjudication, the youth court adopted a permanency plan of reunification. The Mississippi Department of Child Protection Services (CPS) established a "Family Service Plan," which set forth the requirements for Hattie to achieve reunification with the children. The requirements included random alcohol/drug screening, alcohol/drug education, a parenting class, visitation with the children, in-home visits, an employment search, and a mental-health assessment.

¶3. Approximately one year later, in February 2020, the youth court entered an amended permanency order for each child. The youth court indicated that reunification was no longer appropriate or in the best interests of the children and amended the permanency plan to address durable legal custody or legal guardianship. It does not appear that a petition for termination of parental rights (TPR) was filed. However, the amended permanency order noted that "the Mississippi Department of Child Protection Services . . . documented compelling and extraordinary reasons why termination of parental rights would not be in the best interest of [the children]." Ultimately, the youth court awarded legal and physical custody to the children's foster parents—Matthew R. and Melissa R.—and required CPS to monitor the placement for thirty days.

## II. Jones County Chancery Court Proceedings

¶4. After the children had relocated to Jones County in August 2020, Matthew and Melissa filed a TPR petition in the Jones County Chancery Court against Hattie, Robert P., and any unknown or putative father. The TPR petition also named CPS as a party. Matthew

2

and Melissa claimed that Hattie had abandoned and/or deserted JT and RJ and that her habitual substance abuse "demonstrate[d] a substantial risk of harm that [was] detrimental to the children's safety and welfare[.]"

¶5. In January 2021, the Jasper County Youth Court relinquished its jurisdiction in light of the TPR petition that had been filed in the chancery court. Additionally, the Mississippi Department of Human Services and the CPS representative were dismissed from the chancery court proceedings, and a guardian ad litem (GAL) was appointed.

### III.    Motion for Lack of Jurisdiction

¶6. In response to the TPR petition, the remaining defendants filed an answer and a motion to dismiss for lack of jurisdiction in December 2021, arguing that the youth court had continuing jurisdiction over the matter. The defendants also argued that the TPR issue had been adjudicated by the youth court and, therefore, could not be relitigated.

¶7. After a hearing, the chancellor denied the defendants' motion to dismiss. The chancellor noted that the youth court had "clearly expressed its intent to relinquish jurisdiction" and that the defendants had not objected.[2] The chancellor further noted that the "[d]efendants failed to show that a claim for termination of . . . parental rights was ever pursued in [youth court] and/or that such claim was adjudicated on the merits," and therefore the doctrine of res judicata was inapplicable. Thereafter, the case proceeded to trial in April 2022.

---

[2] Although the defendants asserted that they had not been provided with copies of the youth court records or given an opportunity to review them, the chancellor noted that they failed to invoke their right to do so.

## IV. Trial

¶8.     At trial, evidence was presented that JT and RJ lived with three different foster families after they were removed from Hattie's custody in February 2019. Hattie alleged that the first foster parent had neglected JT and RJ, suggesting that some of their issues stemmed from the foster parent; however, the first foster parent did not testify at trial.

¶9.     The second set of foster parents—Kody J. and Tayler J.—testified that they fostered JT and RJ from April 2019 until December 2019. Kody and Tayler noticed that JT and RJ had issues with verbalization, socialization, affection, and eye contact, so they provided speech therapy for both children and behavioral therapy for one of the children. The parents also noticed that JT and RJ lacked structure and discipline. For example, they would eat as much food as possible, and it took them a month to understand that they would be fed regularly. Additionally, one of the children roamed the house at night and was found once climbing inside the refrigerator. Kody and Tayler asked Hattie during a visitation about the children's usual sleep schedule, and Hattie said, "Wherever [RJ] landed [was] where he went to sleep."

¶10.    During visitations, Hattie was an "open boo[k]" with Kody and Tayler and admitted that JT and RJ had been placed into foster care after she was pulled over for drinking and driving with them in the vehicle. She further disclosed that alcohol was her "main problem" and that she used drugs. However, Hattie also told Kody and Tayler that her children had been stolen from her and that she had considered running away with them. Finally, Kody and Tayler testified that Hattie favored JT and did not seem to have a connection with RJ.

4

¶11.    The third set of foster parents who had custody of JT and RJ at the time of trial—Matthew and Melissa—were notified by CPS in December 2019 that Kody and Tayler could no longer foster the children.[3]  Matthew and Melissa—who had previously babysat for Kody and Tayler—agreed to foster JT and RJ.  Matthew and Melissa resided in Jones County, Mississippi.

¶12.    Like Kody and Tayler, Matthew and Melissa were present during at least one of Hattie's visitations with JT and RJ.  During the visitation, Hattie asked for Matthew's and Melissa's personal information, said that her children had been stolen from her, and joked about kidnapping them.  Hattie somehow found out where Matthew worked and sent a letter to his place of employment.  She also posted his name and place of employment on social media "for all the world to see . . . that [Matthew and Melissa had] stolen her [children] from her."  Additionally, Hattie found out where Matthew and Melissa lived, went to their house after dark, and demanded to see JT and RJ.  At some point, Matthew and Melissa obtained a no-contact order; however, despite the order, Hattie mailed a letter to Matthew and Melissa that was disguised as a birthday card to RJ.  In the letter, she stated that she wanted her children back.

¶13.    Hattie, who was forty-four years old at the time of trial, had been JT's and RJ's sole caregiver until they were placed in foster care.  After hearing the testimony that was presented by Kody and Tayler as well as Matthew and Melissa, Hattie testified that she had previously cooked healthy meals for the children and that the children were previously on a

_____

[3] Kody and Tayler explained that fostering was not feasible due to the pregnancy of their third biological child.

schedule and in bed by 8:00 p.m. Although Hattie acknowledged that her bond with JT was stronger, she testified that she had a bond with RJ as well.

¶14. According to Hattie, she had been diagnosed with depression, and she believed that she also suffered from post-traumatic stress disorder. Hattie testified that she had become dependent on alcohol after JT's biological father was murdered during a drug dispute in 2016. She also described an incident in 2018 when she was raped at gunpoint while one of the children was asleep next to her. According to Hattie, she has had five DUIs total. She indicated that she had been arrested for DUI while RJ and/or JT were in the vehicle on three occasions, and two of the three arrests occurred within one month of each other. Hattie admitted that she continued to drink even after JT and RJ were placed in foster care, and she admitted to being intoxicated during at least one visitation. Hattie testified that at one point, she drank a liter of alcohol per day and indicated that she also used methamphetamine.[4]

¶15. Although Hattie began attending Alcoholics Anonymous (AA) meetings after JT and RJ were placed in foster care, she did not complete inpatient alcohol/drug treatment until after the youth court proceedings concluded. Hattie believed that she was stable at the time of trial, but she admitted to having at least one "slip-up," or relapse, since treatment.

¶16. Robert, RJ's biological father, disputed the claim that he had abandoned RJ. However, he acknowledged that he had only seen RJ once since 2018 and that he had not attempted to obtain custody of him. Robert explained that he believed that Hattie should have custody of the children, and he testified that he did not want to split up the children by

_____

[4] In addition to her DUIs, Hattie testified that she had been arrested for domestic violence numerous times but indicated that she had not been convicted.

requesting custody of RJ.

¶17.   In addition to JT and RJ, Hattie had two older children. Hattie's nineteen-year-old son, Zane, testified that he had previously stopped living with Hattie because she was physically and verbally abusive. But he believed that Hattie had changed, and they were living together at the time of trial. Likewise, Hattie's sister testified that Hattie had made changes, and Robert's mother testified that she had observed Hattie caring for JT previously.

¶18.   Edgar Riley, who had attended AA meetings with Hattie, believed that Hattie had been sober for more than a year, but he acknowledged that Hattie had a few "short slip[-ups]." Culista Brooks, Hattie's AA sponsor, testified that she was not aware of Hattie having any slip-ups in the previous nine months.

¶19.   Finally, the GAL testified that she believed that termination of parental rights was in the children's best interests.

### V.    Bench Ruling and Final Judgment

¶20.   During her bench ruling, the chancellor thoroughly discussed the testimony that was presented at trial. The chancellor then found that Hattie had deserted JT and RJ, Robert had deserted RJ, and termination of their parental rights was in the best interests of the children. In her written final judgment, the chancellor reiterated that Hattie had deserted JT and RJ when she failed to demonstrate within a reasonable period of time after their respective births a full commitment to the responsibilities of parenthood. The chancellor cited testimony of alcoholism, drug use, and multiple DUIs. The chancellor noted that Hattie had continued to abuse alcohol during the youth court proceedings. And although Hattie eventually completed

7

a substance abuse treatment program after the youth court proceedings had concluded, it was "too little too late." According to the chancellor, the "flippancy with which [Hattie] often recounted [her relapses]" did not support finding successful rehabilitation and recovery. The chancellor noted that Hattie's testimony "exposed her apparent belief that she [was] the victim" and that Hattie had not accepted responsibility for what occurred.

¶21. Additionally, the chancellor noted that Hattie had abandoned RJ and JT when she continued to abuse alcohol and drugs instead of complying with the requirements for reunification. The chancellor further noted that Hattie had not provided the children with safety, stability, or consistency, and Hattie had recurring patterns of dangerous conduct.

¶22. Ultimately, the chancellor adopted the GAL's conclusions and recommendations. However, the chancellor specifically noted that she had conducted an independent consideration of the testimony and evidence presented at trial. The chancellor found that the decision to terminate parental rights was supported by clear and convincing evidence and held that it was in the best interests of the children.

### DISCUSSION

¶23. On appeal, Hattie claims that the chancery court lacked jurisdiction and that the chancellor's decision to terminate her parental rights was not supported by the evidence.[5]

---

[5] The corrected appellant's brief is somewhat convoluted and appears to be missing several pages. We have stated, "Even a pro se litigant is held to the same procedural and evidentiary requirements as individuals represented by counsel." *Robinson v. Newsome*, 88 So. 3d 767, 769 (¶4) (Miss. Ct. App. 2011). "Regardless, appellate courts generally afford pro se litigants some degree of leeway on appeal." *Id.* We combine the issues raised in the appellant's brief and address what can best be discerned as two issues: (1) jurisdiction and (2) evidentiary support to justify the termination of parental rights.

## I.     Jurisdiction

¶24.    Hattie claims that the Jasper County Youth Court had continuing jurisdiction and therefore the chancery court erred by denying her motion to dismiss for lack of jurisdiction. It was undisputed that the children resided in Jones County at the time of filing the TPR. "Whether the chancery court had jurisdiction to hear a particular matter is a question of law, to which this Court must apply a de novo standard of review." *In re Adoption of Jane*, 360 So. 3d 286, 290 (¶12) (Miss. Ct. App. 2023) (quoting *In re Adoption of C.C.B. v. G.A.K.*, 306 So. 3d 674, 677 (¶8) (Miss. 2020)).

¶25.    Mississippi Code Annotated section 93-15-105(1) sets forth the jurisdiction of termination-of-parental rights proceedings. At the time Matthew and Melissa filed the TPR petition in August 2020, this section provided:

> The chancery court has original exclusive jurisdiction over all termination of parental rights proceedings except when a county court sitting as a youth court has acquired jurisdiction of a child in an abuse or neglect proceeding, then the county court shall have original exclusive jurisdiction to hear a petition for termination of parental rights against a parent of that child.

Miss. Code Ann. § 93-15-105(1) (Rev. 2018).

¶26.    "[T]his statute provides that the 'original exclusive jurisdiction' for 'all termination of parental rights proceedings' is chancery court." *In re Adoption of Jane*, 360 So. 3d at 291 (¶18) (quoting *In re Adoption of C.C.B.*, 306 So. 3d at 687 (¶12)). However, "[a] specific situation is excepted." *Id.* If "a county court sitting as a youth court has acquired jurisdiction of a child in an abuse or neglect proceeding," then that court has "original exclusive jurisdiction to hear a petition for termination of parental rights against a parent of that child."

Miss. Code Ann. § 93-15-105(1).

¶27. Here, Jasper County did not have a county court. Therefore, it had no "county court . . . sitting as a youth court," and the exception does not apply. The chancery court had original exclusive jurisdiction over Matthew's and Melissa's TPR petition in this case.

¶28. Hattie cites *In re M.I.*, 85 So. 3d 856 (Miss. 2012), in support of her argument. In that case, the youth court granted durable legal custody to the children's aunt and uncle. *Id.* at 860 (¶15). Later, they filed a motion to transfer jurisdiction from the youth court to the chancery court for a determination of custody. *Id.* at 857 (¶4). The youth court denied the motion, and they appealed. *Id.* at (¶¶4-5). Ultimately, our supreme court held that "[a] grant of durable legal custody does not preclude the [youth] court from retaining jurisdiction over a matter." *Id.* at 860 (¶15) (citing *In re S.A.M.*, 826 So. 2d 1266, 1279 (Miss. 2002)). This case is distinguishable. Here, the youth court granted durable legal custody or legal guardianship to Matthew and Melissa. However, the youth court subsequently relinquished its jurisdiction to the chancery court by entering an order of "Relinquishment of Continuing Exclusive Jurisdiction" for each child.

¶29. Hattie also claims that the youth court had already decided the issue of termination of parental rights, and therefore the issue was barred by res judicata. In the amended permanency orders, the youth court noted that it had conducted a permanency hearing in accordance with Mississippi Code Annotated section 43-21-613 (Supp. 2019). This section provides for the modification of orders in youth court and allows the court to consider the suitability of continued placement. Miss. Code Ann. § 43-21-613(3)(a). Specifically,

> [t]he judge . . . shall, at the permanency hearing determine the future status of the child, including, but not limited to, whether the child should be returned to the parent(s) or placed with suitable relatives, placed for adoption, placed for the purpose of establishing durable legal custody or should, because of the child's special needs or circumstances, be continued in foster care on a permanent or long-term basis.

*Id.* The statute also provides:

> The court may find that the filing of a termination of parental rights petition is not in the child's best interest if:
>
> > (i) The child is being cared for by a relative; and/or
> >
> > (ii) The Department of Child Protection Services has documented compelling and extraordinary reasons why termination of parental rights would not be in the best interests of the child.

Miss. Code Ann. § 43-21-613(3)(b).

¶30. The youth court noted in its amended permanency orders that "the Mississippi Department of Child Protection Services . . . documented compelling and extraordinary reasons why termination of parental rights would not be in the best interest[s] of [the children]." However, as the chancellor noted, Hattie has not shown that a claim for termination of parental rights was ever pursued in youth court or that such a claim was adjudicated on the merits. Indeed, the record does not show that a TPR petition was filed in the youth court. Furthermore, as discussed, because Jasper County did not have a county court to even sit as a youth court, the chancery court had original exclusive jurisdiction over the TPR petition in this case. For these reasons, we find that the chancellor did not err when she denied Hattie's motion to dismiss.

## II. Termination of Parental Rights

¶31.    Next, Hattie claims that the chancellor's decision to terminate her parental rights was not supported by the evidence.  "In cases where parental rights have been terminated, our scope of review is limited."  *Smith v. Doe*, 314 So. 3d 154, 162 (¶26) (Miss. Ct. App. 2021) (quoting *Little v. Norman*, 119 So. 3d 382, 385 (¶12) (Miss. Ct. App. 2013)).  "In termination-of-parental-rights cases, an appellate court examines 'whether credible proof exists to support the chancellor's finding of fact by clear and convincing evidence.'"  *Rogers v. Kresse*, 365 So. 3d 1047, 1051 (¶14) (Miss. Ct. App. 2023) (quoting *Hartley v. Watts*, 255 So. 3d 114, 118 (¶15) (Miss. 2017)).  "The chancellor's findings of fact are viewed under the manifest error/substantial credible evidence standard of review."  *Id*.  (internal quotation marks omitted).  We "will not substitute [our] judgment for the chancellor's."  *Id*.

¶32.    Mississippi Code Annotated section 93-15-119(1)(a)(i)-(ii) (Rev. 2018) provides that a court may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence

> [t]hat the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and [t]hat termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome[.]

"Abandonment is defined as 'any conduct by a parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child.'"  *Smith*, 314 So. 3d at 163 (¶34) (quoting *M.H. v. D.A.*, 17 So. 3d 610, 616 (¶19) (Miss. Ct. App. 2009)).  Desertion is defined as "[a]ny conduct by the parent over an extended period of time that demonstrates

12

a willful neglect or refusal to provide for the support and maintenance of the child; or [t]hat the parent has not demonstrated, within a reasonable period of time after the birth of the child, a full commitment to the responsibilities of parenthood." Miss. Code Ann. § 93-15-103(d)(i)-(ii) (Rev. 2018). "Even where one of the grounds for termination is prove[d] by clear and convincing evidence, the trial court must still consider whether 'termination is in the best interest of the child.'" *Smith*, 314 So. 3d at 166 (¶43) (quoting *A.B. v. R.V.*, 363 So. 3d 855, 862 (¶38) (Miss. Ct. App. 2019)).

¶33. The chancellor found that Hattie had deserted JT and RJ by not demonstrating, within a reasonable period of time after the birth of the children, a full commitment to the responsibilities of parenthood. The chancellor cited testimony of alcoholism, drug use, and multiple DUIs. Specifically, the chancellor noted that Hattie had continued to abuse alcohol during the youth court proceedings. And although Hattie eventually completed a substance abuse treatment program after the youth court proceedings had concluded, it was "too little too late." According to the chancellor, the "flippancy with which [Hattie] often recounted [her relapses]" failed to support finding successful rehabilitation and recovery. Hattie's testimony also "exposed her apparent belief that she [was] the victim." In other words, Hattie had not accepted responsibility for her actions. Additionally, the chancellor found that Hattie had abandoned JT and RJ when she continued to abuse alcohol and take drugs instead of complying with the requirements for reunification. The chancellor found that the evidence showed that Hattie's prolonged separation from her children resulted exclusively and entirely from her own choices and actions. The chancellor noted that Hattie did not provide JT and

RJ with safety, stability, or consistency and that Hattie had recurring patterns of dangerous conduct. Finally, the chancellor held that termination of parental rights was in the best interests of the children. After review, we find that the chancellor's decision to terminate Hattie's parental rights based on desertion was supported by clear and convincing evidence.

¶34. Hattie suggests that the chancellor relied solely on the GAL's report without making independent findings of fact. However, during her bench ruling, the chancellor thoroughly discussed the testimony that was presented at trial. The chancellor specifically stated in her written final judgment that she conducted an independent consideration of the evidence that was presented at trial.

¶35. Hattie seemingly takes issue with the fact that no expert testimony was presented at trial. However, Hattie does not cite any authority in support of the proposition that expert testimony was required. This Court has held, "Failure to cite legal authority in support of an issue is a procedural bar on appeal." *Herrin v. Perkins*, 282 So. 3d 727, 733 (¶21) (Miss. Ct. App. 2019). Additionally, Hattie argues that certain witnesses were biased in favor of the foster parents; however, the only witnesses who testified for the plaintiffs' case were the plaintiffs themselves (Matthew and Melissa) who were fostering the children at the time of trial and the previous set of foster parents (Kody and Tayler). Hattie was also called as a witness, but she testified as an adverse witness. Furthermore, our supreme court has held, "Considering the . . . credibility [of] the witnesses as well as the weight assigned is the responsibility of the chancellor." *Mabus v. Mabus*, 890 So. 2d 806, 818 (¶51) (Miss. 2003) (citing *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶14) (Miss. 2001)).

14

¶36.    Finally, Hattie claims that long-term personal change has taken place since she lost custody of JT and RJ, and she suggests that her parental rights should be reinstated. However, as discussed, our scope of review is limited. *Roger*, 365 So. 3d at 1051 (¶14). After review, we find that clear and convincing evidence supported the termination of Hattie's parental rights and the finding that termination of parental rights was in the best interests of the children.  Therefore, we affirm the chancellor's judgment.

¶37.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**